Decree reversed and record remitted that distribution may be made in accordance with the view herein expressed, the costs to be paid out of the fund to be distributed. ·

---

## Martin v. Baldy, Appellant.

*Equity—Equity jurisdiction—Criminal prosecution—Acts of June 3, 1911, P. L. 639, and July 25, 1913, P. L. 1220—"Optometry"—Practice of optometry—Multiplicity of suits—Injunction.*

1. A court of equity will not ordinarily enjoin a criminal proceeding against a single individual, but where a multiplicity of suits may be prevented, or where an initial, fundamental question of constitutionality or legal right is involved, equity will assume jurisdiction.    · .

2. Optometry is defined to be the employment of any means other than the use of drugs for the measurement of the powers of vision, and the adaptation of lenses for the correction and aid thereof.

3. An optometrist is not a practitioner in medicine within the meaning of the Act of June 3, 1911, P. L. 639, as amended by the Act of July 25, 1913, P. L. 1220, providing that "it shall not be lawful for any person in the State of Pennsylvania to engage in the practice of medicine or surgery and to hold himself or herself forth as a practitioner. in medicine or surgery......unless he or she has first fulfilled the requirements of this act and received a certificate of licensure from the Bureau of Medical Education and Licensure created by this act."

4. In such case a court of equity properly enjoined the officers comprising such bureau from enforcing certain regulations adopted by the bureau for the examination and licensure of optometrists as practitioners of a branch of medicine and for the prosecution of persons undertaking to practice optometry after a certain date without a license from said bureau, and further restraining the members of said bureau from adopting or enforcing any other regulations affecting the practice of optometry under the authority of said acts.    . ·

Argued March 29, 1915. Appeal, No. 52, Jan. T., 1915, by defendant, from judgment of C. P. No. 4, Philadel-

254          MARTIN v. BALDY, Appellant.

phia Co., June T., 1914, No. 4163, in equity, enjoining
defendants from enforcing certain regulations against
plaintiffs in case of Alexander Martin and Otto G. Hauss-
mann v. John M. Baldy, Nathan C. Schaeffer, Samuel G.
Dixon, William Alvah Stewart, Daniel P. Maddux,
Calvin L. Johnstonbaugh, Adolph Koenig, Members of
the Bureau of Medical Education and Licensure, of the
Department of Public Instruction of the Commonwealth
of Pennsylvania, and together constituting such Bureau;
John M. Baldy, as President of said Bureau, and Nathan
C. Schaeffer, as Secretary of said Bureau.   Before MES-
TREZAT, POTTER, ELKIN, MOSCHZISKER and FRAZER, JJ.
Affirmed.

Bill in equity for an injunction to restrain members
of the State Bureau of Medical Education and Licen-
sure, of the Department of Public Instruction from en-
forcing against the plaintiffs the provisions of the Acts
of June 3, 1911, P. L. 639, and July 25, 1913, P. L. 1220.

The facts appear from the following opinion by WILL-
SON, P. J.:

The plaintiffs have been for many years engaged in
carrying on business in the City of Philadelphia, as op-
tometrists. This business or profession is one in which
those engaged in it, by means of examination of the eyes
of patients, sometimes by the aid of instruments of vari-
ous sorts, endeavor to ascertain the range of vision,
visual powers in general, the extent of the visual field,
the refractive estate or condition of the eye, and the po-
sition and movements of the eye-ball. They also adjust
and make lenses to overcome defects of vision.

As we understand the facts of the case, there is no
essential difference as to the nature of what is done by
optometrists, between the plaintiffs and the defendants.

It is well established by the proofs that optometrists
do not use medicines in the performance of their work,
nor do they resort to anything of the nature of surgical
treatment of eyes.

The defendants, by their regulations, adopted on the 24th of July, 1914, have defined optometry in the following terms: ."Optometry is hereby defined to be the employment of any means other than the use of drugs for the measurement of the powers of vision, and the adaptation of the lenses for the correction and aid thereof."

This definition does not radically differ from the plaintiffs' own definition of the nature of their work, as set forth in paragraph 3 of the bill filed. We have, therefore, substantially adopted that definition as fully expressing what we regard to be the nature of the plaintiffs' work.

It appears from the proofs that the business or profession of optometry is one of ancient standing. Until a comparatively recent date, a large part of that which is done by optometrists was exclusively within their province and was not covered in practice by the efforts of the physician or surgeon. Within the last quarter of a century, or thereabouts, it appears from the proofs that, among those who are engaged in the making of lenses to correct or cure defects in eyes, there has arisen a classification or division, whereby some who make lenses confine themselves entirely to the work of making them in accordance with prescriptions given by physicians or oculists. These call themselves or are known as "opticians"; others, who still manufacture the lenses, either according to their own judgment or the prescription of physicians, do not confine themselves to the making of lenses, but also examine the eyes for the purpose of ascertaining whether there are such defects visible as can be corrected by the application of lenses. This class have taken the name of "optometrists," and that is the name by which they are now generally known.

Those who practice under the latter title are many in number and they are recognized in many states of the union as a class by themselves and regulated by statute.

In the year 1911, (Act of June 3, 1911, P. L. 639), there was enacted in this State, a statute which created "a Bureau of Medical Education and Licensure as a

bureau of the Department of Public Instruction." The preamble to the statute sets forth the purposes which the legislature had in view in making the enactment, and it reads as follows:

"Whereas, The safety of the citizens of this Commonwealth is endangered by incompetent physicians and surgeons, and due regard for public health and preservation of human life demands that only competent physicians and surgeons shall be permitted to practice their profession."

In the section which follows the preamble it was enacted, "That on and after January first, nineteen hundred and twelve, it shall not be lawful for any person in the State of Pennsylvania, to engage in the practice of medicine or surgery or to hold himself or herself forth as a practitioner in medicine or surgery, or assume the title of doctor of medicine or surgery, or doctor of any specific disease, or diagnose diseases, or to treat diseases by the use of medicine or surgery,......excepting those hereinafter exempted, unless he or she has first fulfilled the requirements of this act, and received a certificate of licensure from the Bureau of Medical Education and Licensure, created by this act, which certificate of licensure shall be properly recorded in the office of the superintendent of the Bureau of Public Instruction, at Harrisburg."

The same section further provided that any person wilfully violating the provisions of the section, should, on conviction, be deemed guilty of a misdemeanor and subject to a fine and imprisonment or both at the discretion of the court. It is not necessary for the purposes of the case to state more fully the penal provisions.

By an Act of Assembly, approved July 25th, A. D. 1913, P. L. 1220, the Act of 1911 was amended in certain respects. The particular in which the amendments have the closest bearing upon the present case is the change of the title of the act. That title, as amended by the later of the two statutes, reads as follows: "An act relating

to the right to practice medicine and surgery in the Commonwealth of Pennsylvania; and providing a Bureau of Medical Education and Licensure as a bureau of the Department of Public Instruction; and means and methods whereby the right to practice medicine and surgery and any of its branches, may be obtained, and exemptions therefrom; and providing for an appropriation to carry out the provisions of said act; and providing for revocation and suspension of licenses by said bureau; and providing penalties for violation thereof, and repealing all acts or parts of acts inconsistent therewith." The title as so amended must be regarded as the title of the original act, from the time when the Act of 1913 became operative.

In pursuance of the powers which the defendants, who constitute the Bureau of Medical Education and Licensure, as it was created and empowered by the said enactments, at a meeting of the board, held on the 24th of July, 1914, undertook by regulations, which were then adopted, to bring the optometrists of the Commonwealth within the class of persons who were required by the acts of assembly above referred to, to obtain a license from the said board, before they could lawfully engage in the practice of their business or profession.

These regulations provide that those persons who had been engaged in the practice of optometry within the State for more than two years prior to July 24, 1914, and were of good moral character, should receive a license without examination, and that all other persons practicing optometry within the State, should be subjected to an examination to be held at a date to be fixed thereafter by the board.

It was further provided that applications to practice optometry under the regulations referred to, must be made at the office of the bureau in Harrisburg, on or before the first of November, nineteen hundred and fourteen, and that after January first, nineteen hundred and fifteen, it would be unlawful for any person to prac-

tice optometry within the State or to hold himself out as an optometrist, without having first qualified under certain prescribed tests, which were contained in the regulations adopted by the board. The license fee fixed by the board was the sum of $25.00.

Viewing the case as we do, we do not regard it as necessary to enter more fully into a statement or recital of the regulations of the board in the premises.

The plaintiffs have filed the bill in this case for the purpose of enjoining the defendants from carrying into effect the regulations before referred to and from adopting any other regulations or plans, affecting such persons as desire to practice optometry within the State.

We are also asked to decide that the Act of 1911, as amended by the Act of 1913, is unconstitutional, in so far as it attempts to regulate the practice of optometry, if it shall be held that that was covered by the scope of the statute.

We are also asked to decide that the two acts of assembly referred to, do not purport to, and do not in fact, regulate the practice of optometry in any manner whatsoever.

A considerable number of persons who assert that they are practicing optometrists within the State, have through their counsel, in writing, expressed their desire to join as parties plaintiff in the present case.

Before we take up for consideration what we regard as the principal and most substantial questions in the case, we may as well dispose of two preliminary points which have been raised by counsel.

The first is that taken in behalf of the defendants, to the effect that, as a court of equity, we cannot take jurisdiction of the case because of the penal provisions of the statute; in other words, that a court will not enjoin against a criminal prosecution of those who are charged with having committed offenses under the law. It may be conceded without any hesitation, that under ordinary circumstances, where a single individual de-

sires to obtain a decree from a court of equity, to enjoin a proceeding against him in a court of criminal jurisdiction, relief must be denied to him. We regard it as well settled, so well settled as not to require a citation of authorities upon the subject, that, except in cases where a multiplicity of suits would constitute reason for an exception, or where an initial fundamental question of constitutionality or legal right is involved in the case, a court of equity will not intervene, but will leave the plaintiff to have his rights determined in the criminal proceeding.

In the present case, however, we have both the elements of a multitude of cases and interests and a serious question of constitutional right and privilege, which the plaintiffs, as it seems to us, have a right to have determined in the first instance, and, if their views of their rights are sustained, to be relieved of the annoyance, expense and the possible prosecution, which might otherwise come to them, if their case cannot now be heard and decided. Their right to practice their occupation is a property right and entitled to protection, unless it is regulated and controlled in a lawful manner.

There are many cases which might be cited to sustain the position which we have taken in this matter, but we think it only necessary to refer to the decision in Mahoning & Shenango R. & Light Co. v. New Castle, 233 Pa. 413. We do not understand that the ruling, thus expressly made by the Supreme Court in that case, was intended to be modified in any degree by the ruling of the same court in Pennsylvania R. R. Co. v. Ewing, 241 Pa. 581.

Another point which we will treat at the present time is one which is taken on behalf of the plaintiffs, and that is that the action of the defendants in undertaking to classify optometry as within the meaning of the statutes before referred to, and in prescribing regulations of the same, the board was usurping the powers and

functions of the legislature. We do not regard this point as well taken.

The acts of assembly in question did not attempt to classify any particular branch of medicine or surgery or any branch of medicine or surgery, or any branch of treatment of diseases or deformities. They simply authorized a board to provide for the registration of all persons who came within the prohibition of the statute. That was all that the board attempted to do in the matters involved in the present case. If they were right in regarding optometrists as engaged in the practice of medicine or surgery or doing anything else within the acts prohibited, then we do not see why it was not within the scope of their powers to impose reasonable regulations, and we cannot say that if the optometrists are subject to control by the board, that the regulations imposed are unreasonable.

We are able now to take up what we regard as the serious question or questions of the case. It need not be said that the defendants ought to be encouraged in every proper effort to promote the health of the people in the Commonwealth. Unquestionably, such efforts on their part are of prime importance and nothing but necessity should be permitted to stand in the way of their proper discharge of such duties. We have no question that in the matter now in hand, the board acted in the utmost good faith and under full conviction that they were acting fully within the powers conferred upon them by statute.

It is incumbent, however, upon the court, when a question of the present sort is submitted to it, not only to keep in mind the advantages which might come to the public from a desired interpretation of a statute, but also to regard the rights of others, whose interests may be affected by action taken by such a public body as the defendants constitute.

The serious and substantial question which seems to us to arise in the case under consideration, is whether

or not in any fair, just, or proper sense, it can be said that the plaintiffs and other optometrists of the Commonwealth were embraced within the meaning or application of the acts of assembly before referred to.

In the first place, does the title, as amended by the Act of 1913, cover the plaintiffs, or give any reasonable or fair notice to anybody that they were or could be embraced within the purposes of the legislation contemplated? Every lawyer now knows that, while the title to an act need not be an index to every provision in it, it is necessary in order that the act may be valid that provisions in a statute, the constitutionality of which is challenged, shall be covered without strained or unnatural construction, by the general purposes which are set forth in the title. Can it be said that men who are engaged in a business of recognized and ancient standing, such as optometrists, would have been likely, upon being made aware that a bill was pending in the legislature, having such a title as that which has been cited and quoted, to regard it as having any possible application to themselves? If not, then, they would have been deprived of the opportunity to protest or make suggestions, which, as we understand the case, the constitutional requirement as to the nature of a title of a statute was intended to provide.

These men are not practicing medicine in a popular sense of the term. They give and prescribe no medicines. Nobody pretends that they ever resort to surgery. Why then, supposing one or more of these optometrists had been informed of the pendency of such a bill in the legislature would he reasonably or naturally have regarded the bill as intended to affect people engaged in the same business that he was conducting?

Passing the point just considered, however, can it be said with propriety, that the plaintiffs and others engaged in the same occupation, are engaged in the practice of medicine and surgery, or hold themselves forth as practitioners in medicine and surgery. Nobody as-

serts that the plaintiffs or any others like them assumed the title of doctor of medicine and surgery or doctor of any specific disease, or that they treat diseases by the use of medicine and surgery. As we understand the position of the defendants, it is that the plaintiffs and others like them take certain steps and resort to certain methods, which specialists who treat diseases and defects of the eye, also resort to.

It is likewise claimed, in support of the defendants' position, that there may be diseases which the optometrist, by such processes of examination as he adopts, may not ascertain, and that for that reason he may prescribe glasses when conditions of the patient require other treatment, and that the eyes of the patient may be thereby seriously affected and damaged.

We cannot regard the fact that the work done by the eye specialist physician and that done by the optometrist, to a certain limited extent, lap over each other, constitutes the optometrist a practitioner in medicine. Such work on the part of the optometrist was done by him perhaps and probably long before the eye specialist among physicians had either the knowledge or the skill to do the work which is now done by both physician and optometrist. It is to be supposed that reputable physicians, as a part of their practice, at times resort to the use of electricity and massage as a part of their method of treating diseases. Would it be a fair application of the statutes in question to say that every masseur and every electrician was practicing medicine, because he applied massage or used electrical apparatus in the same way that physicians do or have done?

So far as the alleged danger to patients from the application of glasses or lenses, upon an examination which did not disclose a hidden disease, a point urged with great force on behalf of the defendants, it seems to us that such a consideration throws no light upon the meaning of the statutes or their bearing upon the case in hand. It might constitute a sufficient reason for the

legislature to regulate the practice of optometry by special enactments, or, by suitable enactments or amendments, to bring optometrists within the regulative control of the defendants making up the board entrusted with the supervision over such matters as are involved in the present case.

A good deal has been made in the case, of the prohibition in the first section of the Act of 1911, applicable to persons who "diagnose diseases." It has been claimed that the plaintiffs and other optometrists do diagnose diseases. The proofs in the case are to the effect that optometrists, examining the eye of a patient, either with or without the aid of artificial means, in case they find that the interior of the eye is clouded and gives ground for suspicion that there is some disease of the eye, inform the patient that for his own protection and safety, he should consult a physician. We understand that under such circumstances the optometrists decline to furnish lenses for the patient. Now, is that diagnosing diseases?

We have had a great variety of definitions given, from various lexicographers and from eminent physicians. The word, etymologically and in its general interpretation, signifies, as we understand it, a discrimination, a passing of judgment, as to physical conditions. In a sense, we suppose it may be said that a mother having a child giving signs of whooping cough or some febrile condition, passes judgment upon the case. Is that diagnosis within the meaning of the statute? If a barber finds that the man in his chair shows signs of a diseased scalp or skin, does he diagnose the disease in reaching such a judgment? We think not. We think that a fair and usual construction and interpretation of the words "diagnose diseases," such as we ought to give to them in determining the meaning of the acts of assembly in question, is that the mental act involved in the matter of diagnosis should be something more than the

mere determination that there were indications of disease.

The optometrist does not undertake to determine what disease, if any, exists in an eye which he examines. According to the proofs, it is sufficient reason for a reference of the case to a physician, if there is that which gives him reasonable ground for suspecting that a disease exists. It seems to us that it would be applying a severe rule and stretching language beyond its natural force, if we should say that such action on the part of an optometrist is "diagnosing diseases." The use of the plural noun seems to us to indicate what otherwise would appear to us to be a proper construction, that to "diagnose diseases" meant to distinguish, discriminate, between two or more diseases. If, however, that is too narrow a view to take of the case, the quoted phrase must involve the act of determining what disease exists. This the optometrist does not attempt to do.

It might be said with a great deal of force that the evil which the legislature intended to provide against was that incompetent physicians and surgeons, those who held themselves out to the public as physicians and surgeons, either generally or in a limited sphere, should be subjected to examination by the medical board and to the necessity of obtaining a license to practice medicine and surgery. The enacting clauses of the statute must be interpreted, under familiar rules of construction, with reference to the purposes of the statute as set forth in the preamble as well as in the title. Undoubtedly, whatever would naturally, legitimately, fall within the scope of that which is described in these parts of the statutes, could properly be regarded as covered by the terms of the enactment. Applying this standard, it seems to us that the scope of the defendants' powers is not large enough to embrace the conduct and the occupation of the plaintiffs.

In the present case it is our conclusion that the plaintiffs and those engaged in the same occupation as them-

selves, are not covered by the provisions of the statutes and that even if they were, the acts of assembly, as far as they apply to the plaintiffs, are unconstitutional, because of an inadequate title, as hereinbefore set forth.

This would be our judgment upon broad and general grounds, but we regard it as more imperatively our duty to adopt the foregoing interpretation of the statutes in question, for the reason that the statutes are penal in character and therefore to be strictly construed.

The trial judge had the advantage of the presence of his colleague, Judge Audenried, at the trial of the case, and he fully concurs in the conclusions which are expressed above, and in the formal findings that follow. The general presentation of the case as it precedes those findings, can only be regarded as a fuller statement of the views of the court upon the main questions involved in the case.

The court entered a decree enjoining the defendants as members of and constituting the Bureau of Medical Education and Licensure of the Department of Public Instruction of the Commonwealth of Pennsylvania, from enforcing the regulations affecting the practice of optometry adopted at their meeting held July 24, 1914, and from adopting or enforcing any other regulations or plans under the authority of the Act of June 3, 1911, P. L. 639, as amended by the Act of July 25, 1913, P. L. 1220, affecting the practice of optometry within the Commonwealth.   Defendants appealed.

Error assigned, among others, was the decree of the court.

J. E. B. Cunningham, First Deputy Attorney General, with him Francis Shunk Brown, Attorney General, for appellants.

Owen J. Roberts, of Roberts, Montgomery and McKeehan, for appellees.

PER CURIAM, April 19, 1915:

The majority of the court are of the opinion that the decree should be affirmed on the opinion of the learned president judge of the court below, and it is so ordered.

---

## Preston, Appellant, *v.* Philadelphia.

*Negligence—Municipality—City street—Pipes in street—Injury to child—Nonsuit.*

In an action against a municipality to recover damages for injuries alleged to have been sustained by a four year old child as a result of being caught and wedged between two large iron pipes left lying loose along the gutter of a city street, a nonsuit was properly entered where there was no evidence that the pipes were not placed upon the street in the usual manner, and where the presence of stakes to keep the pipes from moving might have proved more of a menace to the safety of children than their absence, and where the evidence did not show with a reasonable degree of certainty where the accident took place or the position of the pipes at the time of the accident, or that the length of time they had been left there was the proximate cause of the injury, or was necessarily unusual and unlawful.

Argued March 31, 1915. Appeal, No. 111, Jan. T., 1915, by plaintiffs, from judgment of C. P. No. 5, Philadelphia Co., March T., 1911, No. 1858, refusing to take off nonsuit in case of Gladys Preston, by her Father and next friend, James Preston, and James Preston in his own right, v. City of Philadelphia. Before MESTREZAT, POTTER, ELKIN, MOSCHZISKER and FRAZER, JJ. Affirmed.

Trespass for personal injuries.

The pipes from which the injury was alleged to have resulted were 16 inches in diameter, 16 feet long and weighed each approximately 1,400 pounds.

STAAKE, J., filed the following opinion:

The claim before the court is that the defendant had