Williams, J.
 

 After the Court of Appeals had granted the permanent injunctions this court decided the case of
 
 State, ex rel. Brisker, Atty. Genl.,
 
 v.
 
 Buhl Optical Co.,
 
 131 Ohio St., 217, 2 N. E. (2d), 601. Thereafter The Standard Drug Company and The May Company abandoned the plan of operating the optical departments and entered into new agreements.
 

 Each contempt case was submitted on the agreed statement of facts and exhibits attached, for determination of the question whether the new arrangement constituted a violation of the decree enjoining the defendant corporation from practicing optometry and from advertising that it was engaged in such practice.
 

 The transcripts of testimony taken on the hearings in the injunction cases and incorporated in the bills of exceptions are of little value here since the testimony relates'to the old arrangements and the findings in the contempt cases are based on the new arrangements.
 

 As the new plans put into operation were somewhat different, the two cases will be discussed separately.
 

 The Standard Drug Company entered into its new arrangement with I. J. Adelson in July, 1936, by the execution of a written contract of lease. The court below found from the facts and entire arrangement that the existent relationship was not that of landlord and tenant but that of licensor and licensee.
 

 The terms and provisions of the lease were substantially as follows: The Standard Drug Company leased a space (which had been used as an optical department) in the balcony of its storeroom in the Cleveland Arcade Building and also space in the front case in the center of the storeroom to I. J. Adelson, to be used for the conducting of an optical, jewelry and
 
 *633
 
 watch repairing business in consideration of 20% of the gross sales as rent. All sales were to be registered in a cash register and the moneys arising therefrom were to remain in the possession of the lessor until the payments of rent were made. All decorations and improvements were to be made at the expense of lessee and all fixtures and equipment used by the lessee were to be furnished by the lessee. The payments of rent were to be made weekly by deducting 20% of the gross sales made by the lessee and any other charges lessor might have against lessee.
 

 Lessee agreed to hire sales people for the conduct of his business and to employ adequate help for that purpose. Sales people and other employees were to be paid by the lessee, and lessee was to conduct his business on the premises in strict compliance with the law and save lessor harmless from expenses, costs and damages.
 

 Lessee further agreed to maintain an ample stock of merchandise but the lessor was to have no responsibility nor any connection with the merchandise, sales or sales policy of the lessee. Lessee agreed not to contravene the rules and general policy of the lessor in conduct of lessee’s business.
 

 Lessee could lease a part of the space to an optometrist with the consent of lessor and lessor should not have any right o-r interest in the business of lessee.
 

 These are in substance all the terms of the lease.
 

 There can be no question of The Standard Drug Company’s right to lease its premises or a part thereof to either an optician or optometrist so long as it receives no part of the fees arising from the practice of optometry and in no way participates in the practice of that profession. The written instrument was by every test a lease. It conveyed an estate for a definite term with reservation of rent. The fact that the rental was a percentage of gross receipts does not alter the
 
 *634
 
 case. It has recently become common to require the payment of such a percentage as rental; in fact it is considered a fair and just way of measuring rental value. .When all the elements are considered, there is nothing in the contract of lease that shows the legal status of the contracting parties to be other than landlord and tenant. True the lease contains some provisions not usually incorporated in such instruments but none of them is illegal, or opposed to public policy The contract is on its face entirely valid.
 

 The court, however, is not limited by the terms of the lease but will consider the manner in which the optical business was conducted and the extent to which the corporation participated in transactions involving optometrists.
 

 In actual business practices The Standard Drug Company, on receiving and retaining moneys from the sale of glasses with the purpose of securing the payment of rent, issued sales slips and cash register receipts in its own name. There was nothing illegal or improper in this practice so long as charges for optometrical services were not illegally included to its knowledge. That knowledge does not appear from the record; in fact no part of fees paid the optometrist ever came into the hands of either lessor or lessee.
 

 The circumstances under which the practice of optometry was carried is shown in the following quotation from the agreed statement of facts:
 

 “That Albert J. Kudysh, a duly registered optometrist, has the following arrangement with Mr. I. J. Adelson. Commencing July 1st, 1936, all patients who came to Dr. Kudysh for examination were charged a fee of $1 by Dr. Kudysh, which sum was received and retained in cash by Dr. Kudysh himself. This dollar did not go through the cash register of The Standard Drug Company, nor did it in any manner directly or indirectly, get into the possession of The Standard
 
 *635
 
 Drug Company or I. J. Adelson. At the end of each week, Mr. Adelson paid to Dr. Kudysh the difference between the.total received by Dr. Kudysh from examination fees for that week and $60, the said sum of $60 being the guarantee given by Mr. I. J. Adelson to Dr. Kudysh, in consideration of his maintaining his office in the space leased by Mr. Adelson in The Standard Drug store. This is a verbal agreement and continues up to the present time, and it is contemplated that it will continue.
 

 “That Dr. Kudysh is present at the store in the Old Arcade, and in the space leased by Mr. Adelson, from approximately 9:30 a. m. to 6:00 p. m. daily and from 12 noon to 5:00 p. m. on Sundays, for the purpose of examining the eyes of patients visiting the said premises; that at the time that the arrangements between Dr. Kudysh and Mr. Adelson were entered into, it was understood that Dr. Kudysh was to charge $1 for examination of the patient, which is to be retained by Dr. Kudysh and is not to be included in the price of the glasses, if the patient hired Mr. Adelson to fill the prescription.
 

 “That upon completing the examination of any patient, Dr. Kudysh writes out the prescription for the type of glasses needed, if any, and receives his fee of $1 from the patient, thereupon he informs the patient that he may go to any optician to have the prescription filled, and that if he desires to do so, Mr. Adelson is in a position to fill the prescription; that during the period that Dr. Kudysh has been located in the store, to date, about sixty patients out of 600 or 700 which he has examined, have gone to other places to have their prescriptions filled; that Dr. Kudysh makes a case-record of every examination made by him, in duplicate, that one copy is given to the patient and one copy is retained by Dr. Kudysh as his private records; that when a patient decides that he wishes to purchase the
 
 *636
 
 glasses from Mr. Adelson, who is present on the premises all day, Mr. Adelson then proceeds to take the measurements in accordance with the prescription, and agrees with the patient upon the price to he paid for the glasses complete; that Mr. Adelson is not a licensed optometrist in the state of Ohio. After taking the measurements, Mr. Adelson sends the prescription out to be filled by a manufacturer of lenses, who does the grinding in accordance with the prescription, and returns the completed lenses to Mr. Adelson, and the glasses are then fitted to the patient by Mr. Adelson, and the sale is then complete.”
 

 As heretofore indicated, the Court of Appeals held that the lease ■ and subsequent conduct of those concerned and the manner of doing business did not give rise to the relation of landlord and tenant but that of licensor and licensee. That court also held that under the new arrangement as carried out Kudysh, the licensed optometrist, and Adelson, were merely agents of The Standard Drug Company, and that through' the acts of its agents the company violated the injunction.
 

 Of course a lease, valid on its face, may be a mere sham or devise to cover up the real transaction; but such a subterfuge will not be permitted to become a cloak for illegal practices. The courts will always pierce the veil to discover the real relationship. Where a corporation directly or indirectly engages in the practice of optometry the lease will afford no protection on a proper challenge of the illegality.
 

 There is nothing in the record to show want of good faith on the part of The Standard Drug Company— nothing to show that the writing was a mere ruse to cover up an illegal arrangement whereby The Standard Drug Company aided or abetted Adelson and Kudysh or either of them in the performance of an act' that constituted the illegal practice of optometry
 
 *637
 
 in violation of the injunction. In fact it is expressly stipulated in the agreed statement of facts: ‘ ‘ That all arrangements between Dr. Kudysh and I. J. Adelson have been made and carried out between themselves alone; that The Standard Drug Company has in no way been a party to such arrangements, except in that The Standard Drug Company has been apprised of the fact that an optometrist has been located in the store; that The Standard Drug Company, up to the time of the preparation of this stipulation, had no knowledge whatsoever of the arrangement existing between Dr. Kudysh and I. J. Adelson.”
 

 What is the legal aspect of the relation between Kudysh and Adelson?
 

 Section 1295-22, General Code, provides: “That on and after January 1, 1920, it shall not be lawful for any person in this state to engage in the practice of optometry or to hold himself out as a practitioner of optometry, or attempt to determine the kind of glasses needed by any person, or to hold himself out as a licensed optometrist when not so licensed, or to hold himself out as able to examine the eyes of any person for the purpose of fitting the same with glasses, excepting those hereinafter exempted, unless he has first fulfilled the requirements of this act and has received a' certificate of licensure from the state board of optometry created by this act, nor shall it be lawful for any person in this state to represent that he is the lawful holder of a certificate of licensure such as is provided for in this act, when in fact he is not such lawful holder or to impersonate any licensed practitioner of optometry or to fail to register the certificate as provided in section 1295-29 of this act.
 

 “Any person violating the provisions of this section shall be guilty of a misdemeanor * * *.
 

 Section 1295-34, General Code, reads: “The provision of this act shall not apply (a) to physicians or
 
 *638
 
 surgeons practicing under authority of licenses issued under the laws of this state for the practice of medicine or surgery, or (b) to persons selling spectacles and eye-glasses but who do not assume directly or indirectly to adapt them to the eye, or neither practice nor profess to practice optometry.”
 

 Under these sections one who is not.a licensed optometrist cannot set himself up in business as an optician and employ optometrists to do optometrical work in connection with the optical business. An optometrist is one who by the application of the optical principles and the employment of technical methods and devices examines human eyes to ascertain the departures from the normal, measures their functional powers and adapts optical accessories for the aid of sight. Section 1295-21, General Code. In the narrow sense used herein, an optician is one engaged in the business of furnishing glasses to customers on the prescription of a licensed optometrist or qualified physician and fitting the frames thereof to the face. Kudysh was an optometrist duly licensed in Ohio; Adelson was not so licensed. Adelson could not do indirectly what he was forbidden by law to do directly. Indirectly he employed Kudysh by giving him free office space and guaranteeing him $60 a week upon condition that Kudysh should charge one dollar for the examination of the patients. Kudysh was willing to charge as small a fee as one dollar in consideration of the guaranty and free space. Such employment of an optometrist is illegal. However, this illegal act did not constitute a violation of the injunction. The Standard Drug Company was only enjoined from practicing optometry as a corporation and from advertising that it was so practicing. It was wholly legal and proper to have an optometrist located on the demised premises with the knowledge and approval of lessor. The wrong consisted in the illegal contract between the lessee
 
 *639
 
 and the optometrist, of which contract the lessor had no knowledge. Neither Adelson nor Kudysh were agents of the lessor in any respect and that company participated in no way in the illegal transaction. If the company had by some overt act aided or abetted the wrong a different question would be presented. Since the injunction ran against the corporation and its ‘ ‘ officers, agents, employees and licensees, ’ ’ Kudysh and Adelson by engaging in the illegal practice between themselves exclusively and not as agents or representatives of the corporation, did not violate the injunction. A remedy lies against Kudysh and Adelson by appropriate proceeding or action.
 

 Did The Standard Drug Company and I. J. Adelson violate the injunction by inserting in a newspaper the advertisement marked Exhibit B? There is a stipulation in the agreed statement of facts which reads: ‘ ‘ That the advertising that is done in the various newspapers in the city of Cleveland, is in accordance with Exhibit B, hereto attached, and is billed to The Standard Drug Company, and the space used is billed to Mr. Adelson, by The Standard Drug Company, and is paid for by him monthly, as The Standard Drug Company is billed monthly by the newspapers. Each advertisement bears the following wording ‘I. J. Adelson, owner of Optical Department, at Standard Drug Store. ’ The Standard Drug Company is billed by the newspaper and then recompensed by Mr. Adelson for the reason that The Standard Drug Company by reason of its large advertising appropriation, obtains a better rate than could be obtained by Mr. Adelson were he billed by the newspaper direct. ’ ’
 

 There is no-legal objection to such an arrangement provided the advertisement itself is in accordance with law. With reference to the nature of the advertising the agreed statement contains this further stipulation: “That Exhibit B, being a sample advertisement of
 
 *640
 
 I. J. Adelson, owner of Optical Department at Standard Drug Store, makes no reference to, nor does any advertisement inserted by the said department in the newspapers, refer to examination of eyes or the performance of other optometric services.” The parties to the contempt case evidently regarded the advertising as legal, bnt as Exhibit B is part of the record this court must look to that original evidence. . The advertisement was put out over the name of “I. J. Adelson, Owner of Optical Business Office at 411 Euclid Avenue in Standard Drug Store,” and contained the words: “Proper Glasses Quickly Give Relief” and, “Pitting by Expert Optician.” This advertisement was calculated to mislead the reading public by giving the impression that Adelson, optician, furnished and fitted proper glasses. Pitting glasses means fitting them to the eyes as well as to the face; the only fitting the optician can do is to the face by frame bending.
 
 State, ex rel. Bricker, Atty. Genl.,
 
 v.
 
 Buhl Optical Company, supra.
 
 Por this illegal advertising Adelson is answerable; but the question here is: Did its publication constitute a violation of the injunction? The defendant, The Standard Drug Company, was restrained “from advertising or entering into any agreement whereby said defendant, its officers, directors and agents agree to furnish optometric service.” The advertisement specified that the fitting was to be by Adelson, who in no way represented the company. It was not such advertising as was expressly forbidden by the court.
 

 There is another phase to this line of inquiry. The advertisement amounted to a holding out that Adelson was practicing optometry. Did the drug company, by paying for the advertisement and then billing Adelson, aid and abet the wrongful act so that it could be said that the company was indirectly practicing optometry?
 

 
 *641
 
 The record does not show that the drug company had anything to do with making up the advertisement or even knew what was in it. The company could hardly be guilty of aiding and abetting a wrong of which it was unaware. Under all the circumstances the action of the company with respect to this advertisement did not constitute a violation of the injunction.
 

 However, there was certain window advertising that stands on a different footing.
 

 The agreed statement of facts contains the following : ‘ ‘ That at the store of The Standard Drug Company on Euclid avenue and the Arcade, there appears in the' window facing Euclid avenue, two (2) illuminated signs upon which are printed or lithographed, a picture of a human eye, with the following lettering: ‘Eyes examined — glasses fitted,’ and in said store window facing the Arcade, there appears an illuminated sign with a picture or lithograph of a human eye, and the words, ‘Registered Optometrist — Eyes Examined, ’ and another sign with the following lettering: ‘Optical Department offers the best in glasses at lowest prices.’ There is no lettering on any of the signs in the windows indicating the owner of the Optical Department or the name of the registered optometrist, excepting such lettering on the windows proper as indicate that the store is The Standard Drug Company.”
 

 This window advertising amounted to a holding out to the general public that The Standard Drug Company examined eyes, fitted glasses and was a licensed optometrist. While it is not disclosed who placed the signs in the windows or who kept those that were illuminated in operation, they were held out to the public to be the signs of the drug company and for them the company is responsible in the absence of further showing. This conduct plainly violated the terms of the injunction and warranted the court below
 
 *642
 
 in adjudging the drug company guilty of contempt.
 

 There is not a syllable in the agreed statement of facts or exhibits which relates to C. Edward Roseman and Torrence K. Lamb except as they may have participated in executing the lease of July, 1936, which of itself was wholly legal. What is more neither of them joined in the agreed statement of facts, and the transcript of testimony covered a period before the original decree and so could not afford evidence that the injunction was violated. Since the execution and delivery of the lease was of itself a wholly legal and proper act, there is no evidence to connect Roseman and Lamb with the charge of contempt. Neither Adelson nor Kudysh was a party to the injunction suit; and strange to say there is no stipulation that either of them knew of the existence of the injunction. As a general rule no one not a party to an injunction suit can be guilty of contempt for violating the injunction without knowledge" that it has been granted.
 
 Toledo, A. A. & N. M. Ry. Co.
 
 v.
 
 Pennsylvania Co.,
 
 54 F., 746, 19 L. R. A., 395;
 
 Garrigan
 
 v.
 
 United States,
 
 163 F., 16, 23 L. R. A. (N. S.), 1295;
 
 People, ex rel. Stearns,
 
 v.
 
 Marr,
 
 181 N. Y., 463, 74 N. E., 431, 106 Am. St. Rep., 562;
 
 Ex parte Testard,
 
 102 Tex., 287, 115 S. W., 1155. Adelson testified in the injunction case but knowledge of the pendency of such a suit would not be sufficient. True the journal entry in the contempt proceeding recites that the company, Roseman, Lamb, Adelson and Kudysh were given opportunity to purge themselves of contempt and failed to do so; yet they could not be required to purge themselves of contempt of which there was not proof in the record and in default thereof be found guilty. Lastly the charge in contempt (which is found in the motion for citation) names no person other than the defendant company; so these individual persons were adjudged in contempt without specific charges against
 
 *643
 
 them. The action of the court below as to them was prejudicially erroneous.
 

 In The May Company case the new lease to Benjamin Gainsburg, not licensed as an optometrist in Ohio, was made on or about June 1,1936, for a money rental of $12,500 for a period of six months. This lease contained two provisions, not in the lease given by The Standard Drug Company:
 

 “It is mutually agreed between the lessor and lessee as follows, to wit: * * *
 

 “That the Lessor will have the right to purchase from the Lessee all credit accounts of the Lessee arising from business done by the Lessee on the demised premises.
 

 “At the time of the rendition by the Lessor to the Lessee of a statement of moneys received by the Lessor as in Item 1 of these mutual covenants provided, the Lessor will pay to the Lessee all moneys received by it as shown by said statement, plus the purchase price of all accounts purchased by the Lessor and less any amount due from the Lessee to the Lessor as rent and any other amounts owing by the Lessee to the Lessor.”
 

 It was clearly a valid lease on its face and gave rise to the relation of landlord and tenant.
 

 It remains to consider whether transactions following the execution and delivery of the lease were in any respect violative of the injunction.
 

 The agreed statement of facts in The May Company case was entered into between counsef representing the plaintiff and counsel representing the defendants, The May Company, Nathan L. Dauby and David Geller, and recited the following:
 

 “That all cash received from sales made in the optical department is received and retained by an employee of Benjamin Gainsburg until the end of the day when it is delivered to The May Company, and
 
 *644
 
 that in the sale of merchandise no charge is made for optometric services;
 

 “That all employees of the optical department are employed by Benjamin Gainsburg and paid by him and that among said employees are duly registered optometrists who examine eyes and fit optical appliances; * * * '
 

 “That the optometrist employees of the said Benjamin Gainsburg q,re A. H.. Wittlig, Kenneth Hoose, Samuel Levy, Boyal Clisby and Henry Fredrick;
 

 “That on the 15th day of each calendar month an accounting is had between The May Company and Benjamin Gainsburg of the money .received for the preceding calendar month, from which sum is deducted the monthly rental as set forth in the lease, plus the cost of newspaper advertising and trading stamps, and after deducting said sum there is added the amount due Benjamin Gainsburg for accounts purchased by The May Company from him during said period, and that there is no charge made by The May Company to the said Benjamin Gainsburg for the keeping of the accounts;
 

 “That all furniture, furnishings and equipment in said department are the property of Benjamin Gains-burg and all purchases for said department are made by Doctor Henry Fredrick, his manager in charge, and none of the same is ever charged to The May Company ; and Doctor Fredrick makes all refunds and adjustments for said department;
 

 ‘ ‘ That Eagle Trading Stamps are sold by The May Company to merchants in the Cleveland territory and are likewise sold by The May Company to Benjamin Gainsburg;
 

 “That over the entrance to said department is an illuminated sign bearing the words ‘Optical Department’ and under the same is painted ‘B. Gainsburg, Owner.’ ”
 

 
 *645
 
 An additional stipulation was afterwards entered into between the plaintiff and the defendant, The May Company, which reads: “That, if David Geller, Secretary of The May Company, were called to the stand, he would testify that when the lease of June 1, 1936, between The May Company, as lessor, and Benjamin Gainsburg, as lessee, was executed, The May Company and its officers were told by the lessee that at that time he did not know whether the lessee would hire optometrists direct, or whether he would lease space to optometrists, and The May Company executed said lease on the advice of its counsel to the effect that the lease was in accordance with law and not a breach of the injunction.”
 

 The employment of optometrists by Gainsburg to do optometrical work was illegal for reasons already given. The May Company in accordance with the lease received daily from Gainsburg the cash taken in by him through sales in the optical department and an accounting was had between them on the 15th of each month and there was deducted from the money, the monthly rental plus the cost of newspaper advertising and trading stamps, and after making these deductions, allowance was made to Gainsburg for accounts purchased from him by the company. If The May Company had actual knowledge of the illegal employment of optometrists by Gainsburg, undoubtedly, the company would be so far participating in the unlawful arrangement as to amount to a violation of the injunction. The only evidence of such knowledge is in the stipulation that the secretary would, if called, testify that at the time the lease was executed the company by its officers was told by the lessee that he did not know whether he would hire optometrists direct or lease space to them.
 

 We may assume that this occurred for there is no contradiction in the record. It does not follow that
 
 *646
 
 the company had actual knowledge of the relation between the lessee and the optometrists. Whether The May Company, through its officers, endeavored to find what the relation was and failed, or whether they remained inactive is undisclosed. Since a violation of the injunction may be punished by fine or imprisonment, one charged with contempt should not be found guilty of the charge because a condition existed of which it did not actually know. Of course actual knowledge may be proved by circumstantial evidence but the cause has been submitted upon an agreed statement of facts, and, except what was said at the time the lease was signed, the record is silent on the question of knowledge.
 

 Gainsburg in his advertising asserted that his optical department furnished glasses “well fitted.” This constituted an unlawful. holding out that he was engaged in the practice of optometry, and what has been heretofore said regarding such a course of conduct is applicable.
 

 There is nothing in the record to charge The May Company with responsibility for the course pursued by Gainsburg in this connection.
 

 Notwithstanding the illegality of the employment of optometrists, there is nothing in the record that would warrant a finding that any of the' optometrists, A. H. Wittlig, Kenneth Hoose, Samuel Levy, Royal Clisby or Henry Fredrick, violated the injunction. They were not agents of the corporation and it is not shown that they had any knowledge of the order of injunction. Of the five, only Wittlig and Levy were fined for contempt, and they did not join in the agreed statement of facts or subsequent stipulation. None of the optometrists was named personally in the charge of contempt and, as for Gainsburg himself, he was not cited for contempt.
 

 In our judgment there was no violation of the in
 
 *647
 
 junction by The May Company or its officers or by the optometrists employed by Grainsburg named therein.
 

 The judgment in the case of Bowe, Appellee, v. The Standard Drug Company et ah, Appellants, is affirmed as to the appellant, The Standard Drug Company, and is reversed as to the remaining appellants, and final judgment entered in their favor.
 

 The judgment in the case of Bowe, Appellee, v. The May Company et al., Appellants, is reversed and final judgment entered for appellants.
 

 Judgments accordingly.
 

 Jones, Matthias and Day, JJ., concur.
 

 Weygandt, C. J., Zimmerman and Myers, JJ., dissent from the judgment in The May Company case and dissent from the judgment in The Standard Drug Company case except the affirmance as to The Standard Drug Company.