No. 23042.

The People of the State of Colorado, ex rel., Duke W. Dunbar, Attorney General of the State of Colorado, and The State Board of Optometric Examiners of the State of Colorado *v.* Lee Optical Company of Denver, a Colorado corporation, doing business under the trade name of Douglas Optical Company, Kenneth Reeves, O.D., Stewart Goldstein, O.D., Clarence E. Johnson, O.D., John Moncrieff, O.D., M. L. Perito, O.D., Emmanuel Fleischer, O.D., Harold Capps, O.D., Edwin J. Snickerson, O.D., and Robert Byall, O.D.

(452 P.2d 21)

Decided March 10, 1969.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, WILLIAM TUCKER, Assistant, CLIFTON A. FLOWERS, Special Assistant, RICHARD A. BILLUPS, JR., Special Assistant, for plaintiffs in error.

McNICHOLS, NIGRO & BALDRIDGE, JOSEPH F. NIGRO, DOUGLAS BERGMAN, for defendant in error Lee Optical Company of Denver.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

THIS was an action brought by the Attorney General and the State Board of Optometric Examiners (herein called the plaintiffs) to enjoin the alleged unlawful practice of optometry by a corporation in contravention of our optometry statute (C.R.S. 1963, 102-1-1 *et seq.*) and to enjoin alleged acts by licensed optometrists in violation of that statute. The corporation is Lee Optical Company of Denver, doing business under the trade name of Douglas Optical Company, and will be referred to herein as Douglas Optical. The optometrists are referred to as the individual defendants.

The science of the eye, of light, and of light refraction is rooted in antiquity. A history of these subjects would relate the research and achievements of a host of mathematicians and physicists, including Galileo and Sir Isaac Newton. These activities, including the advancement of physicians in the field of ophthalmology, constituted a professional activity. In the past 100 years the optical

arts with their variegated proliferations spilled over in some measure from the professional cup to the business pot, *i.e.*, at the beginning of this century many opticians, who could be regarded more as businessmen than professionals, prescribed and dispensed spectacles. During the past 70 years the extent and quality of training of optometrists, who are not physicians, has vastly improved. The statute involved here reflects the advancement of the optometrist to higher professional status (in his art of examination of the eye and prescription of eye glasses) and the continued presence of the optician as an artisan-businessman (in his field of dispensing spectacles).

Optometrists have been licensed in this state for the past 56 years. Opticians are not licensed in Colorado. Prior to 1961 certain opticians, such as Douglas Optical, had optometrists as their employees, performing their services within the place of business. In 1961 the aforementioned statute was amended into its present form and was made to provide that it is a ground of revocation of an optometrist's license if he practiced as a partner, agent or employee of an unlicensed person, group, association or corporation. The statute prescribes several other standards and prohibitions.

The complaint in this action alleged that the individual defendants were "employing or offering compensation or merchandise of value to runners and other persons, including Douglas Optical and its agents, as an inducement to secure the services and assistance of said runners and other persons, including Douglas Optical and its agents, in the solicitation of patronage for the performing, rendering and selling of optometric services by said individual defendants * * *." It further alleged that the individual defendants were "practicing optometry as the partners, agents, or employees of or in joint venture or arrangements with Douglas Optical * * *." At the close of the plaintiffs' case, the court granted a motion to dismiss as to the individual defendants for the reason that there was no evidence to support the alle-

gations of the complaint with respect to them. We affirm this particular ruling. Douglas Optical was thereupon left as the only defendant.

■ At the conclusion of the defendant's case the court found that Douglas Optical was unlawfully practicing optometry by making changes in prescriptions for eye glasses without the permission or authority of the individual defendants, and the court enjoined it from making any changes in prescriptions for eye glasses or contact lenses without the permission or authority of the prescribing professional practitioner. We approve of this finding and affirm the court's injunctive order.

The court in its other findings follows closely the substance of the allegations of the complaint and the applicable provisions of the statute. Therefore, to avoid the iteration of setting forth the allegations of the complaint, the provisions of the statute and the findings of the court, we simply quote the findings, from which the allegations and statutory provisions readily can be envisaged. The findings are as follows:

"1. That there is no evidence to support the allegation in the Complaint that the corporate defendant has, either directly or indirectly, guaranteed to the individual defendants, or any of them, an annual income;

"2. That there is no evidence to support the allegation in the Complaint that the corporate defendant is, by its agents, fitting and adapting contact lenses to the human eye;

"3. That there is no evidence to support the allegation in the Complaint that the corporate defendant is publishing false, misleading or deceitful claims or statements relating to optometric services or ophthalmic materials or devices;

"4. That there is no evidence to support the allegation in the Complaint that the corporate defendant is employing, or offering compensation or merchandise of value to, runners or other persons, including the individual defendants, as an inducement to secure the services

or assistance of said runners or other persons, including the individual defendants, in the solicitation of patronage for the supplying or selling of ophthalmic materials or devices by the corporate defendant;

"5. That there is no evidence to support the allegation in the Complaint that the corporate defendant is interfering with the exercise of free choice by patients in the selection of practitioners licensed to perform examinations for refractions and visual training or corrections within the field of optometry by directing said patients to the individual defendants for the purpose of an optometric examination;

"6. That there is no evidence to support the allegation in the Complaint that the corporate defendant is, in any manner, sharing in the professional fees derived by the individual defendants from the practice of optometry;

"7. That there is no evidence to support the allegation in the Complaint that the corporate defendant, under the guise of a rental percentage lease or sublease or other leasing or rental arrangement, participates in the direction and control of the optometric practice of the individual defendants or in the receipts or profits accruing to the individual defendants therefrom;

"8. That there is no evidence to support the allegation in the Complaint that the corporate defendant is unlawfully practicing optometry in a corporate capacity, except with respect to the filling of prescriptions for eyeglasses, and in that regard the Court finds that the corporate defendant is unlawfully practicing optometry in a corporate capacity by making changes in prescriptions for eyeglasses without the permission or authority of the prescribing lessee-optometrists and that such conduct on the part of the corporate defendant is in derogation of the public health and safety of the people of the state of Colorado."

The court concluded that, except as to the matters which as mentioned were the subject of its injunction, Douglas Optical was not violating the statute and would

not be enjoined. We approve all but three of the findings and with respect to the three remand for additional findings.

Douglas Optical has four stores in the Denver metropolitan area. Another corporation, Lee Optical Company of Colorado, closely associated with Lee Optical Company of Denver, operates optical dispensing stores under the name of "Douglas Optical" in Colorado Springs, Pueblo, Greeley and Grand Junction. There is evidence in the record as to the method of operation of these last mentioned four stores. However, as Lee Optical Company of Colorado is not a party of this action we confine ourselves strictly to the operations of Lee Optical Company of Denver.

Prior to 1961 Douglas Optical in one or more of its stores employed optometrists who rendered their services within the stores. With the adoption of the 1961 amendment it made some changes which in our view might be characterized, not as compliance in good faith with the spirit of the amendment, but rather as an avoidance of violation of the provisions of the statute. There was considerable argument relative to the ethics and business practices of Douglas Optical. Our concern here, however, must be whether it contravened the statute; it cannot be with conduct not proscribed by law.

Since 1961 Douglas Optical has leased or subleased space adjacent to each of its stores to an optometrist for the practice of his profession. These leases provide that the demised premises shall be occupied as an optometric office and not otherwise; that the lessee may not assign or sublet without the consent of the lessor; that the lessee may not place any signs about the premises except as first approved by the lessor; that the tenancy shall be from month to month; and finally, that either party may cancel at the end of any 30-day period by giving the usual ten-day written notice.

The room or rooms leased to the optometrist are separate from the adjacent dispensing store. To go from the

store to the office, one must first go out on the street, although there is little distance between the door to the store and the door to the office.

Each of the four stores has a large sign advertising Douglas Optical which is flush with the front of the building and is above the first floor ceiling level. This sign is above both the doorway to the store and the doorway to the office. Above this sign is an overhanging sign advertising Douglas Optical. All of the signs are garish. Each of the overhanging signs proclaim, "GLASSES — ONE PRICE — $12.90." Some say, "EASY CREDIT." The signs flush with the front wall have the name in extremely large letters, "DOUGLAS OPTICAL," and some have the same advertising contained on the overhanging sign. The door leading to the optometrist's office has on it only a sign in rather tasteful lettering advising that it is the office of a designated optometrist.

There is a firm with offices in Texas called Dal-Tex. The exact connection with the Douglas Optical and Dal-Tex was not shown, but the evidence disclosed that Douglas Optical obtained its lenses and frames from Dal-Tex, that some of the individual defendants leased ophthalmic equipment from Dal-Tex and paid rental to it, and that in Dallas the address of Dal-Tex was identical with that of the home office of Douglas Optical. It appears from the record that the *modus operandi* of Douglas Optical and of the individual defendants was as follows:

Upon entering a Douglas Optical store a customer would state he wished to purchase a pair of glasses. The clerk would advise him that glasses could not be prepared and sold to him except under a prescription of a doctor licensed to make eye examinations and prescriptions. The customer would inquire which doctor he should see and where he could find him. The clerk would respond that there were many optometrists available, that the customer could pick out anyone he wished but that doctor so-and-so was an optometrist in the office next door.

A patient would enter an individual defendant's office and at his request be examined for spectacles. The optometrist would write out a prescription and hand it to the patient, stating that he should take it to an optical company to have the prescription filled. Upon inquiry of the patient as to where he should take the prescription he was told that he could take it to any optician but Douglas Optical was next door and could fill it.

There was considerable evidence that the optometrists fixed their own fees for examinations and maintained office hours of their own choosing. Their fees were charged and collected separately from the charges made by Douglas Optical for the spectacles or contact lenses dispensed.

It was stiplated that "from fifty to sixty percent of the prescriptions filled by Douglas Optical were prescriptions written by doctor lessees [individual defendants], and 35.5 percent of the patients examined by lessee doctors were referred to them by Douglas Optical."

One of the Douglas Optical stores is at 501 - 16th Street in Denver. Douglas Optical leased the entire premises for $1,850 per month and subleased an upstairs office to an optometrist for rental of $250 per month. The plaintiffs argue that the $250 rent was not adequate and that this is evidence of a guarantee of annual income by Douglas Optical to the optometrist. However, for this evidence to be effective the reasonable rental value of the optometrist's office would have to be shown, and this the plaintiffs failed to do.

The plaintiffs contend that Douglas Optical was publishing false, misleading or deceitful claims. In support of this they pointed out that the advertisements offered single vision glasses for sale at the "one low price" of $12.90 and contact lenses either $49.50 or $59.50, depending on the date of the advertisement; but that the words "single vision" always appeared in smaller print than the words "glasses," "one low price," and "$12.90." The evidence disclosed that Douglas Optical did sell single

vision glasses for $12.90 and that the prices on bifocals ranged from $15.90 to $19.90, and on trifocals are up to $32.90.

▮▮ We agree with the findings of the trial court numbered 1, 2, 3, 4 and 6, *viz.*, that there was no evidence to support the allegations which were the subject of those findings. We cannot agree with the trial court's determination that there was no evidence to support the allegations involved in findings numbered 5, 7 and 8.

Douglas Optical argues that the findings of the trial court that there was no evidence to support certain allegations of the complaint are equivalent to findings that the evidence was not sufficient to support the allegations. We must disagree with this contention. There was testimony supporting the allegations involved in findings numbered 5, 7 and 8. It might be that the trial court intended his "no evidence" findings to mean lack of sufficient evidence. However, we must be mindful of the possibility that in finding "no evidence" the trial court may have overlooked certain testimony. We now mention some of this testimony.

One of the witnesses for the plaintiffs was John H. Raeber, a licensed optometrist. Formerly he had leased space from Douglas Optical Company in Denver, first at 520 - 16th Street and later at 503 - 16th Street. He testified at length concerning statements made by Martin Price, a Douglas Optical representative. He testified that Price insisted that when Raeber took a day off he should hire a Dr. Johnson to replace him at a salary of $125 per day; that Price told him not to take referrals from persons other than Douglas Optical; that Douglas Optical kept his business cards on their counter; that he charged fees as specified by Douglas Optical; that Douglas Optical representatives would bring elderly patients to his office; that it dictated the hours that he should work; and that Douglas Optical had given him to understand that, if he did not perform as they wished, the lease would be terminated.

A former employee of Douglas Optical, Mrs. Vera Cridlebaugh, testified for the plaintiff. She testified that Douglas Optical would change prescriptions to different types of lenses or frames in order to avoid more expensive items prescribed; that these changes were made only with respect to prescriptions of optometrists who were Douglas Optical's lessees and were not made to prescriptions of ophthalmologists or other optometrists; that Douglas Optical kept more elaborate records and analyses of their lessee-optometrists than of other doctors; and that it was general procedure to refer customers to the lessee-optometrist next door. There was testimony that each Douglas Optical store sent daily reports of the number of prescriptions by lessee-optometrists to the home office of Douglas Optical, whose address in Dallas, Texas as previously mentioned was identical with Dal-Tex Optical Company.

Parts of Dr. Raeber's testimony on direct examination were fairly well discredited on cross-examination. There was considerable evidence in conflict with the testimony of these two witnesses. It was up to the trial court — and it is not our province — to measure the credibility and weight of the testimony of these witnesses. However, this testimony and other evidence relates to one or more of the allegations that Douglas Optical was interfering with the exercise of free choice by patients; that it was through the leases participating in the direction and control of the individual defendants; and that it was unlawfully practicing optometry. It is for this reason that we cannot concur with the finding of "no evidence" with respect to these matters.

Some of the authorities cited by the plaintiffs in support of the position that Douglas Optical is illegally controlling the individual defendants are the following: *State Board of Dental Examiners v. Miller,* 90 Colo. 193, 8 P.2d 669; *State Board of Dental Examiners v. Savelle,* 90 Colo. 177, 8 P.2d 693; *People v. Painless Parker Dentist,* 85 Colo. 304, 275 P. 928; *Ritholz v. Arkansas State Board*

*of Optometry,* 206 Ark. 671, 177 S.W.2d 410; *Lieberman v. Connecticut State Board of Examiners in Optometry,* 130 Conn. 344, 34 A.2d 213; *Pearle Optical Co. of Monroeville, Inc. v. Georgia State Board of Examiners in Optometry,* 219 Ga. 364, 133 S.E.2d 374; *Bennett v. Indiana State Board of Registration and Examination in Optometry,* 211 Ind. 678, 7 N.E.2d 977; *State v. Zale Jewelry Company of Wichita,* 179 Kan. 628, 298 P.2d 283; *State ex rel. Beck v. Goldman Jewelry Co.,* 142 Kan. 881, 51 P.2d 995; *McMurdo v. Getter,* 298 Mass. 363, 10 N.E.2d 139; *Reyburn v. Minnesota State Board of Optometry,* 247 Minn. 520, 78 N.W.2d 351; *Sears Roebuck & Co. v. State Board of Optometry,* 213 Miss. 710, 57 So.2d 726; *Rowe v. Standard Drug Co.,* 132 Ohio St. 629, 9 N.E.2d 609; *State ex rel. Sisemore v. Standard Optical Co. of Oregon,* 182 Or. 452, 188 P.2d 309; and *Martin v. Baldy,* 249 Pa. 253, 94 A. 1091. We have perused them, but we regard none of them, nor other authorities cited, as having factual situations which would support a determination by us as a matter of law that an injunction should issue under the allegations involved in findings numbered 5, 7 and 8. Unless accompanied by additional evidence of proscribed control by the optician over the optometrist, there is no prohibition of one recommending the other, one referring the customer-patient to the other, or the optician leasing equipment to the optometrist.

Particular thought has been given to whether the fact that the leases to the optometrists were on a month-to-month basis and had a ten-day termination clause as a matter of law shows a control by Douglas Optical over the optometrists. The plaintiffs have urged *State ex rel. Beck v. Goldman Jewelry Co., supra,* as authority for such declaration on our part, but the facts in that case show far more evidence of control than the short termination period under the lease. On remand the trial judge can consider this factor in connection with sufficiency of evidence as it relates to finding numbered 7.

An assignment of error was that the court should not

have denied an offer of proof as to the length of time an optometrist should take in conducting an eye examination and of the extent of education that an optometrist must have before presenting himself for a licensing examination. We fail to see the materiality of this testimony to the issues as framed.

▋ Plaintiffs have urged the following statement in *Bald Eagle Mining and Refining Company v. Brunton* 165 Colo. 28, 437 P.2d 59; "Since this case is here on a motion to dismiss, the evidence must be looked at in the light most favorable to plaintiff." That statement must be construed only in connection with the fact situation in that case. See *Teodonno v. Bachman,* 158 Colo. 1, 404 P.2d 284. Whether or not it was incumbent upon the trial court to view the evidence in the light most favorable to the plaintiffs with respect to the dismissal of the complaint as to the individual defendants at the close of plaintiffs' case, the court announced that it was so viewing the evidence; and, as previously indicated, we find no reversible error here. Except as to the allegations of the complaint which the trial court sustained, it indicated at the close of plaintiffs' case that they had not proved their case as to Douglas Optical. However, it overruled the motion to dismiss as to Douglas Optical and it was not until the close of the entire case that it made its determination with respect to Douglas Optical. Therefore, there is applicable the well known rule that, if there is sufficient evidence for findings and judgment of the trial court, they will not be disturbed on review. *Lestoque v. Arnold,* 116 Colo. 293, 180 P.2d 862.

The trial court must make findings as to whether there was sufficient evidence to sustain the allegations referred to in findings numbered 5, 7 and 8. The trial judge may review the record of the case and his notes — which near the conclusion of the trial he stated were copious — and make a determination as to whether there was sufficient evidence in these respects. Upon making the

new findings, the trial court shall enter an appropriate decree thereon.

The judgment is affirmed in part, reversed in part and remanded for further action by the trial judge consonant with the views herein expressed.