**Jane CONRAD, Phillip Danielson, Richard Grundmann, and David Hofer, Plaintiffs-Appellants,**

**v.**

**The CITY AND COUNTY OF DENVER, Defendant-Appellee.**

No. 82SA267.

Supreme Court of Colorado, En Banc.

Dec. 6, 1982.

As Modified on Denial of Rehearing Jan. 24, 1983.

Jane Conrad, Phillip Danielson, Richard Grundmann, David Hofer, pro se.

Max P. Zall, City Atty., Stan M. Sharoff, Darlene M. Ebert, Asst. City Attys., Denver, for defendant-appellee.

LOHR, Justice.

This case presents the question whether the action of the City and County of Denver (Denver) in displaying a nativity scene, or creche, on the steps of the City and County Building as part of the Christmas holiday building decorations violates *Colo. Const.* Art. II, § 4.

Jane Conrad, Phillip Danielson, Richard Grundmann and David Hofer brought this action against Denver in Denver District Court seeking a declaratory judgment that Denver's nativity scene display violates *Colo. Const.* Art. II, § 4, injunctive relief prohibiting inclusion of the creche among the holiday decorations on the steps of the City and County Building, and an order that the nativity scene be sold at public auction. At the conclusion of the plaintiffs' case, the trial court granted Denver's motion that the complaint be dismissed for failure of the plaintiffs to establish a prima facie case in support of the claimed constitutional violation.[1] We reverse and remand for further proceedings.

The plaintiffs contend that the trial court erred in ruling that they had not established a prima facie case. In addition, the plaintiffs assert error in a number of the district court's evidentiary rulings. Denver, on the other hand, supports the trial court's order of dismissal and its rulings on the

---

1. As discussed in part V.A.2. of this opinion, the parties and the trial court incorrectly assumed that the sufficiency of the evidence should be tested by the standard applicable to a motion for a directed verdict in a jury trial, under C.R.C.P. 50(a), rather than under the criteria applicable to a motion for dismissal in a trial to the court, pursuant to C.R.C.P. 41(b)(1), as would have been appropriate. For reasons discussed in part V.A.2. of this opinion we review the ruling under the same standard applied by the trial court.

evidence, and asserts that the plaintiffs failed to prove standing to sue. At the outset, however, Denver contends that we should stay the exercise of our jurisdiction until the United States Tenth Circuit Court of Appeals has ruled on the consistency of the nativity scene display with First Amendment principles in a case now pending before that court.

We first trace the history of litigation challenging Denver's use of the creche, and then outline the evidence presented before the trial court and the trial court's ruling. Next we consider the appropriateness of the exercise of our jurisdiction while the federal case remains pending, and finally address the merits of this appeal.

### I.

The present case is the third in a series of suits challenging the inclusion of a creche among the Christmas holiday decorations at Denver's City and County Building. A summary of the earlier cases and of their present status will provide a useful background for our discussion of the issues before us.

In 1979, Citizens Concerned for Separation of Church and State, an unincorporated association, brought suit in the United States District Court for the District of Colorado challenging the nativity scene display as contrary to the Establishment Clause of the First Amendment to the United States Constitution. The district court found that challenge meritorious and enjoined Denver from including the creche among the Christmas decorations at the City and County Building. *Citizens Concerned For Separation of Church and State v. Denver,* 481 F.Supp. 522 (D.Colo.1979) (*Citizens Concerned I*). On appeal, the United States Tenth Circuit Court of Appeals reversed. The appellate court did not reach the constitutional issue, concluding that the proof was inadequate to establish

the standing of the plaintiff unincorporated association to maintain the action. *Citizens Concerned For Separation of Church and State v. Denver,* 628 F.2d 1289 (10th Cir. 1980). In a later proceeding in the same case, the United States Tenth Circuit Court of Appeals held that the plaintiff was precluded from further proceedings in the trial court in an effort to establish standing. *Denver v. Matsch,* 635 F.2d 804 (10th Cir. 1980). The United States Supreme Court denied certiorari. 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981).

The same plaintiff filed a new action in United States District Court for the District of Colorado in December 1980 seeking the same relief and relying on the same First Amendment grounds as in the earlier litigation. After an evidentiary hearing the plaintiff's motion for a preliminary injunction was denied. *Citizens Concerned For Separation of Church and State v. Denver,* 508 F.Supp. 823 (D.Colo.1981). A further hearing was held in August 1981 to consider the plaintiff's request for a permanent injunction against display of the creche, and relief again was denied. *Citizens Concerned For Separation of Church and State v. Denver,* 526 F.Supp. 1310 (D.Colo.1981) (*Citizens Concerned II*). The plaintiff appealed to the United States Tenth Circuit Court of Appeals, and that appeal remains pending.

### II.

The case now before us was commenced in December 1981. The plaintiffs were not parties to the earlier-filed suits in federal court. Because the federal litigation and the present case concern the same Christmas decorations at Denver's City and County Building, we rely in part on the description of the holiday decorations presented in the reported federal cases to supplement the evidence in the record before us.[2]

---

**2.** *Citizens Concerned I* was brought in advance of the 1979 Christmas season. *Citizens Concerned II* was filed early in December of 1980. Although the case now before us involves the decoration of Denver's City and County Building for the 1981 season, the descriptions of the

display as set forth in the federal cases reflect that it has remained essentially the same over the years. There is no indication in the record in the instant case that there is any dispute about the appearance of the holiday decorations.

For many years Denver has erected and maintained a lighted holiday display at the City and County Building, which houses Denver's governmental offices. The display is put in place by mid-December and is maintained until the end of the National Western Stock Show in the latter part of January. The entire face of the block-long building is lighted by colored lights during the Christmas season and while the stock show is in progress. The stone steps leading to the main entrance at the center of the structure are decorated with the message "Merry Christmas" and with three sets of figurines. In the center are Santa Claus in a sleigh pulled by eight reindeer.[3] On one side is a group of elves at work, representing Santa's workshop. On the other is the creche, consisting of a barn-like structure and figurines representing the baby Jesus in a manger, Mary, Joseph, shepherds, wise men, and a number of domestic animals. The figurines of the adults in the nativity scene are approximately life-size and are posed about the Christ child in attitudes of reverence. On the building, toward the center, are wreaths, candles, a lighted message, "Seasons Greetings," Christmas trees, and other items associated with the holiday season.

The plaintiffs are non-Christians who have paid various types of Denver taxes, including head tax, sales tax, motor vehicle registration tax, and amusement tax. Only one is a Denver resident. All testified that they objected to the nativity scene display. Mr. Grundmann stated that he feels the creche represents Christianity. He related his family's experience with persecution in Germany in the late 1930s, his emigration to the United States—motivated in some part by his admiration for the United States Constitution and its Bill of Rights—and his belief that the use of the creche in Denver's holiday display violates that Constitution. Mr. Danielson testified that inclusion of the nativity scene among the decorations offends him because it is a representation of one religion and gives preference to that religion over others. Ms. Conrad testified that the creche as used by Denver is disturbing to her because it reflects a governmental preference for one religion over others. She related that her grandparents had come to the United States as the result of religious persecution by Christians in Eastern Poland. She stated, "I think this kind of an exhibit coerces people, is providing peer pressure for people to believe what the government specifies is the state religion." She also related that on two occasions she had seen people standing near the creche in what appeared to be attitudes of prayer. Mr. Hofer testified simply that he objects to the inclusion of the nativity scene in the holiday display.

The other witnesses included two ministers, who testified as experts on the origin of the Christmas celebration, expressed their opinions that the creche represents Christianity, and stated the view that Christianity is favored by government because of the inclusion of the nativity scene in the City and County Building display. In addition, a member of the Jewish faith testified that, as a child, she became upset when viewing the creche, for it made her feel that her religion was not a good one because it did not include belief in the nativity. She testified that even in maturity she finds it somewhat upsetting to view Denver's holiday display. Another witness related that he had seen a Christian religious service being conducted in front of the nativity scene and told of being shoved and threatened by Christians while he was protesting the presence of the creche among the city's holiday building decorations. Other witnesses as well testified to seeing religious observances taking place in front of the creche.

After all the testimony had been presented the trial court took judicial notice that

---

**3.** It is not clear from the evidence in the case before us and the reported decisions in *Citizens Concerned I* and *Citizens Concerned II* whether Santa Claus is always in the center or whether the relative positions of the three sets of figu-

rines are varied from year to year. *See Citizens Concerned I,* 481 F.Supp. at 523. The description in our opinion is based on the 1981 display.

the Christian religion is the only religion symbolized by the nativity scene.

At the conclusion of the plaintiffs' case, Denver moved to dismiss for failure to establish a prima facie case that *Colo.Const.* Art. II, § 4, had been violated. After hearing argument, the trial court granted that motion. The court found that the creche represents the birth of Christ and that the plaintiffs are non-Christians who took offense at the display. It also found that the plaintiffs had not established that any of their tax money was spent to maintain the creche, although it found as well that Denver had admitted that funds are appropriated for the display and storage of the nativity scene. The court grounded its ruling, however, on its conclusion that "the actions of the defendant in creating and providing the nativity scene each year are not in violation of Section 4, Article 2 of the Colorado Constitution." The judge explained this conclusion only by saying that "[t]he mere fact that such display each year may be offensive to one, two or three persons is no grounds to grant the relief requested by the plaintiffs."

### III.

We now consider whether we should defer the exercise of our jurisdiction to await the decision of the United States Tenth Circuit Court of Appeals in the appeal from the decision of the United States district court in *Citizens II.*

Our review of the United States district court decision reflects that the First Amendment to the United States Constitution was the sole basis for challenge to Denver's nativity scene display. No issue was raised under Colorado's constitution. Conversely, in the case now before us the plaintiffs bottom their arguments solely on *Colo. Const.* Art. II, § 4; no First Amendment question is raised. While we have stated that Article II, Section 4, "embod[ies] the same values of free exercise and governmental non-involvement secured by the religious clauses of the First Amendment" and "echoes the principle of constitutional neutrality underscoring the First

Amendment," *Americans United for Separation of Church and State Fund, Inc. v. State,* 648 P.2d 1072, 1081, 1082 (Colo.1982) (*Americans United*), determination of the First Amendment challenge will not necessarily be dispositive of the state constitutional question. Resolution of issues under Article II, Section 4, ultimately requires analysis of the text and purpose of that section. *Id.* at 1082. More importantly, however, it is not an abstract legal question we are asked to decide. As will be developed later in this opinion, the constitutional sufficiency of Denver's Christmas display is dependent in important part on factual determinations. These must be based on the record in the proceeding before us. Therefore, we conclude that we should proceed to decide the issue under our state constitution without awaiting the decision of the federal court on whether Denver's display comports with First Amendment requirements. *Cf. Anderson v. Salt Lake City Corporation,* 475 F.2d 29 (10th Cir.1973) (where a basic federal constitutional right is asserted, the federal court will not stay exercise of its jurisdiction to await a state court decision on the legally independent issue of construction of a similar state constitutional provision).

### IV.

We are met at the threshold by Denver's claim that the plaintiffs lack standing to bring this action, and we address that issue first.

The trial court intimated agreement with Denver's claim by finding that the plaintiffs had not proved that their taxes were used to construct or maintain the nativity scene, but went on to ground its decision on the merits of the claim under *Colo. Const.* Art. II, § 4. We hold that standing was adequately established by the evidence.

We adopted the following test for standing to enforce rights under state law in *Wimberly v. Ettenberg,* 194 Colo. 163, 168, 570 P.2d 535, 539 (1977):

The proper inquiry on standing is whether the plaintiff has suffered injury in fact to a legally protected interest as contem-

plated by statutory or constitutional provisions.

The "injury-in-fact" requirement is dictated by the need to assure that an actual controversy exists so that the matter is a proper one for judicial resolution, for consistent with the separation of powers doctrine embodied in Article III of the Colorado Constitution, "[c]ourts cannot, under the pretense of an actual case, assume powers vested in either the executive or the legislative branches of government." *Id.,* at 167, 570 P.2d at 538. The requirement that the interest injured be of a type legally protected by statutory or constitutional provisions is a prudential rule of standing based on judicial self-restraint. *Id.*

■ The prudential considerations of standing are met in the present case because the injury allegedly suffered by the plaintiffs is to a legally protected interest as contemplated by *Colo. Const.* Art. II, § 4, which specifically forbids that any individual be required to support a particular religion and prohibits the governmental preference of any religion. Our holding that the prudential requirement of the standing rule has been satisfied is based on the plaintiffs' allegations and is not equivalent to a holding on the merits of the plaintiffs' claim that the governmental action in this case shows actual preference or support for a particular religion within the meaning of this constitutional provision. *See Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission,* 620 P.2d 1051 (Colo.1980).

The constitutional injury-in-fact requirement of standing is satisfied by the combined injuries alleged by the plaintiffs to two of their legally protected interests: (1) their intangible interest in a government that does not prefer or support the Christian religion over all others, including their own, *see Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission, supra,* and (2) their economic interest in having their tax dollars spent in a constitutional manner.[4] Although the economic portion of the plaintiffs' alleged injury is at best indirect and very difficult to quantify, we have held a similar type of injury to be sufficient for standing purposes under the test of *Wimberly v. Ettenberg, supra,* in *Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979). In *Dodge,* a state taxpayer challenged the use of state funds to finance nontherapeutic abortions as contrary to *Colo. Const.* Art. V, § 33, which prohibits disbursement of state funds except upon appropriations made by law or except as otherwise authorized by law. In both the present case and *Dodge v. Department of Social Services, supra,* the plaintiffs alleged injury flowing from governmental violations of constitutional provisions that specifically protect the legal interests involved. We conclude that the types of injury claimed here are sufficient for standing purposes.[5] *See Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission, supra.*

Denver argues that the United States Supreme Court holding in *Valley Forge*

4. While all four plaintiffs have paid taxes in Denver, arguably the intangible interest in a municipal government that does not prefer one religion over another is more attenuated for the three plaintiffs who are nonresidents of Denver. There is no argument advanced by the city that the three nonresidents lack significant contacts with Denver or that they purposefully paid Denver taxes in an attempt to "manufacture" standing to sue. We do not address what effect nonresident status may have in a case with a different factual background.

5. A primary consideration underlying our inquiry into the plaintiffs' standing to bring a lawsuit to challenge allegedly unconstitutional governmental acts is our concern for the proper function of the judicial branch of government as contemplated by the separation of powers doctrine. In addition to our belief that the plaintiffs here have met the injury-in-fact and prudential requirements of the standing doctrine as set forth in our cases, we recognize that the judicial branch is the most appropriate forum for consideration of the plaintiffs' objections to the creche, primarily because their religious beliefs may not be representative of the majority of citizens in this community. One of the main evils that the federal and state constitutional religion clauses seek to prevent is the oppression that a sectarian majority may visit upon citizens with unpopular beliefs. *See Abington School District v. Schempp,* 374 U.S. 203, 226, 233, 83 S.Ct. 1560, 1573, 1577, 10 L.Ed.2d 844, 860, 864 (1963).

*Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) precludes a finding of standing based on an injury to an intangible interest. In that case, the Court held that federal taxpayers and citizens did not have standing to challenge on Establishment Clause grounds a donation of federal property to a church-related college pursuant to legislation adopted under the Property Clause of the United States Constitution, *U.S. Const.* art. IV, § 3, cl. 2, because they presented merely a "generalized grievance" rather than injury in fact. The *Valley Forge* case involved standing to enforce federal constitutional rights under the standing doctrine developed pursuant to the clause of the United States Constitution limiting federal judicial power to certain "cases" and "controversies," *U.S. Const.* art. III, § 2, cl. 1. While we have previously looked to federal constitutional cases for guidance in developing our standing rules under the separation of powers clause in the Colorado Constitution, we are not strictly bound by such decisions when no federal constitutional rights are asserted. *Cloverleaf Kennel Club, Inc. v. Colorado Racing Commission, supra; Wimberly v. Ettenberg, supra.* Additionally, the *Valley Forge* case did not overrule *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), which allows federal taxpayer standing to enforce Establishment Clause rights in certain circumstances analogous to the plaintiffs' assertion of state constitutional rights in the present case. Just as the federal Establishment Clause acts as a specific constitutional limitation on Congress' taxing and spending power, *id.,* the state constitutional provision at issue here prohibits the use of public funds for the support or preference of one religion to the exclusion of all others. Finally, the *Valley Forge* case did not overrule the Court's earlier opinion that municipal taxpayers, as opposed to state or federal taxpayers, more clearly have standing to object to governmental expenditures in violation of the law because of the more direct relationship between local government actions and citizens of the municipality.

*Frothingham v. Mellon,* 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078 (1923); *see Donnelly v. Lynch,* 691 F.2d 1029 (1st Cir.1982).

■ The holding in *Valley Forge,* therefore, does not persuade us to depart from the reasoning of *Dodge v. Department of Social Services, supra,* which applies state standing principles to allow taxpayers to invoke the assistance of the courts to prevent injury to a legal interest specifically protected by a state constitutional provision. We hold that the plaintiffs here have standing to assert their claims under the test established in *Wimberly v. Ettenberg, supra.*

## V.

We turn now to the merits of the plaintiffs' claims of error. Central is the plaintiffs' contention that they established a prima facie case of violation of *Colo. Const.* Art. II, § 4. We consider that issue first and then address the plaintiffs' assertions that the trial court erred in the following respects: (1) allowing questioning of witnesses about their religious beliefs contrary to C.R.E. 610, (2) excluding proffered evidence of the practices of nations having established religions as to the erection of statues of gods in front of governmental buildings, (3) ruling that testimony about statements made by participants in Christian devotional services in front of the creche were hearsay and therefore inadmissible, and (4) failing to take judicial notice of certain matters at the request of the plaintiffs.

### A.

In determining whether the plaintiffs' evidence was sufficient to withstand the motion to dismiss, we first determine the appropriate test for analyzing governmental conduct under Article II, Section 4, of the Colorado Constitution and then apply that test to the plaintiffs' evidence within the procedural context of this case.

#### 1.

Article II, Section 4, of the Colorado Constitution provides:

The free exercise and enjoyment of religious profession and worship, without discrimination, shall forever hereafter be guaranteed; and no person shall be denied any civil or political right, privilege or capacity, on account of his opinions concerning religion; but the liberty of conscience hereby secured shall not be construed to dispense with oaths or affirmations, excuse acts of licentiousness or justify practices inconsistent with the good order, peace or safety of the state. *No person shall be required to attend or support any ministry or place of worship, religious sect or denomination against his consent. Nor shall any preference be given by law to any religious denomination or mode of worship.* (Emphasis added.)

The plaintiffs claim that inclusion of the creche in Denver's holiday display violates the emphasized portion of that constitutional provision, primarily the last sentence of the section (the Preference Clause).

In an early case, we first had occasion to consider the meaning of Article II, Section 4. In *People ex rel. Vollmar v. Stanley*, 81 Colo. 276, 255 P. 610 (1927), a school board rule requiring Bible reading in the classrooms of a school district was upheld against challenges on several constitutional grounds, including a claim that the rule violated Article II, Section 4. We held, however, that it was necessary to this result that attendance at the Bible reading sessions not be compulsory.[6] We disposed of the Preference Clause issue in a single sentence, stating, "[i]t is scarcely necessary to say that this clause refers only to legislation for the benefit of a denomination or mode of worship and is aimed to prevent an established church." *Id.* at 285, 255 P. at 615. The mandatory Bible reading in the class-

rooms was also held not to constitute a schoolhouse as a "place of worship," which we defined as "a place set apart for such use." *Id.* at 286, 255 P. at 615.

Very recently, we again considered the rights afforded by Article II, Section 4, in *Americans United.* In that case we reviewed the relationship between the protections secured by *Colo. Const.* Art. II, § 4, and those contained in the Establishment and Free Exercise Clauses of the First Amendment to the United States Constitution, and stated:

> Although the provisions of Article II, Section 4 are considerably more specific than the Establishment Clause of the First Amendment, we read them to embody the same values of free exercise and governmental non-involvement secured by the religious clauses of the First Amendment. The Colorado constitution expressly guarantees to all persons the right, in matters of religion, to choose their own course free of any compulsion from the state. To secure this right it removes from the political sphere any form of compulsory support or preference in matters of religion. In this respect Article II, Section 4 echoes the principle of constitutional neutrality underscoring the First Amendment. That principle prohibits the type of governmental involvement that leads to restraint on free choice in religious matters or to control of churches, *Walz v. Tax Commission,* 397 U.S. [664] at 670–71, 90 S.Ct. [1409] at 1412, 25 L.Ed.2d [697] at 702.

648 P.2d at 1081–2. Because the federal and state constitutional provisions embody similar values, we look to the body of law that has been developed in the federal courts with respect to the meaning and application of the First Amendment for

**6.** Subsequently, the United States Supreme Court has struck down, on Establishment Clause grounds, a state statute requiring daily Bible reading in public schools notwithstanding a provision that a pupil may be excused on parental request. *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963). Because our construction of *Colo. Const.* Art. II, § 4, in *Vollmar v. Stanley, supra,* gives that section a meaning con-

trary to the Establishment Clause, *Abington School District v. Schempp, supra,* and because we construe our state constitution's provisions in a manner that will preserve their validity under the federal constitution, *Americans United,* we conclude that *Vollmar v. Stanley, supra,* wrongly interpreted the requirements of Art. II, § 4, and now overrule it to the extent that it is inconsistent with the Establishment Clause standards set forth in *Abington.*

useful guidance. However, we are mindful that the specific "text and purpose" of our state constitutional provision must be considered in this process. *Americans United,* 648 P.2d at 1082.

The First and Fourteenth Amendment[7] proscriptions against governmental action "respecting an establishment of religion or prohibiting the free exercise thereof" have engendered extensive litigation in the federal courts. The guiding principle in applying First Amendment requirements in specific factual contexts has been stated by the United States Supreme Court as follows:

> The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

*Walz v. Tax Commission,* 397 U.S. 664, 669, 90 S.Ct. 1409, 1411–12, 25 L.Ed.2d 697, 702 (1970).

In determining whether particular governmental action violates the principles underlying the First Amendment's Establishment Clause, the United States Supreme Court applies one of two tests, depending upon whether the effect of the governmental action is to favor religion in general or to discriminate among religions. The test that has been applied most frequently is the three-part test enunciated in *Lemon v. Kurtzman,* 403 U.S. 602, 612–3, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971):

> First, the statute must have a secular legislative purpose; second, its principal

or primary effect must be one that neither advances nor inhibits religion [citation omitted]; finally, the statute must not foster "an excessive government entanglement with religion." [citation omitted].

These three criteria set forth in *Lemon v. Kurtzman* have been viewed as "guidelines" within which to consider "the cumulative criteria developed over many years and applying to a wide range of governmental action challenged as violative of the Establishment Clause." *Tilton v. Richardson,* 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790, 798 (1971).

Very recently, the United States Supreme Court held that the *Lemon v. Kurtzman* test is only to apply in analyzing laws affording a uniform benefit to all religions, and that "strict scrutiny" is appropriate in reviewing laws that discriminate among religions. *Larson v. Valente,* 456 U.S. 228, 102 S.Ct. 1673, 72 L.Ed.2d 33 (1982). The Court noted, however, that the same concerns reflected in the *Lemon v. Kurtzman* criteria warranted the application of strict scrutiny to the denominationally preferential statute before it. The Court found that a Minnesota statute requiring that charitable organizations register with the state and report contributions received, but exempting those organizations that obtain more than half of their total contributions from members or affiliated organizations, clearly had the effect of preferring certain religions over others.[8] Applying the strict scrutiny test, the Court held the statute unconstitutional because the state had not shown that the statutory requirements were closely fitted to further a compelling governmental interest.

■ *Larson v. Valente* apparently mandates the use of strict scrutiny analysis in

---

7. As applied to the states through the Fourteenth Amendment, the First Amendment proscription against Congressional legislation respecting an establishment of religion or prohibiting the free exercise of religion is equally applicable to executive governmental action. *See Abington School District v. Schempp, supra* (Brennan, J., concurring).

8. The United States Supreme Court agreed with the Eighth Circuit Court of Appeals' observation in the case under review that the statute distinguishes between well-established churches with strong membership financial support, on the one hand, and new churches without such a constituency, as well as churches with a policy of favoring public solicitation, on the other.

every case where governmental discrimination among religions is demonstrated and is challenged on First Amendment grounds. In considering the test to be applied in the case before us to evaluate the sufficiency of Denver's conduct under *Colo. Const.* Art. II, § 4, we find that the issues involved and the specific text and purpose of our state constitutional provision make application of strict scrutiny analysis inappropriate. In *Larson v. Valente,* the preferential effect of the statute under consideration was self-evident upon its application to different religious groups. In the present litigation, however, the existence of preferential treatment, which triggered the use of strict scrutiny in *Larson v. Valente,* remains the major unresolved point of contention. *But see Donnelly v. Lynch, supra* ("because the City's ownership and use of the nativity scene is an act which discriminates between Christian and non-Christian religions it must be evaluated under the test of strict scrutiny." (Slip op. at 16). The defendant hopes to show that inclusion of the creche in Denver's holiday display does not constitute preferential treatment within the meaning of the Colorado Constitution because it merely depicts the historical origins of Christmas. The plaintiffs, however, have attempted to prove that the creche cannot be divorced from its religious significance to Christians and that by including the nativity scene among the Christmas decorations Denver is giving a preference to the Christian religion. Moreover, the language of Colorado's Preference Clause is clear. While a preference may survive an Establishment Clause challenge if justified by, and closely tailored to the furtherance of, a compelling governmental interest, *Larson v. Valente, supra,* the Preference Clause flatly prohibits any preferential treatment cognizable under the Colorado Constitution.[9]

■ While the strict scrutiny test applied in *Larson v. Valente* was not designed to aid in the sensitive line-drawing process necessary to determine whether particular governmental activity constitutes unconstitutional preferential treatment of religion,[10] we believe that the test set forth in *Lemon v. Kurtzman, supra,* was specifically formulated for this purpose. Recognizing that the Establishment Clause does not contain "precisely stated constitutional prohibitions," the United States Supreme Court formulated the three-part test in *Lemon v. Kurtzman* with reference to the "three main evils against which the Establishment Clause was intended to afford protection" to aid in determining whether particular governmental conduct crosses the line into the zone of forbidden activity. 403 U.S. at 612, 91 S.Ct. at 2111, 29 L.Ed.2d at 755. Our state constitutional provision which, like the Establishment Clause,[11] prohibits "preferential treatment to religion in general or to any denomination in particular," *Americans United, supra,* 648 P.2d at 1082, also does not specifically enumerate the types of governmental conduct that are considered unconstitutional. The *Lemon v. Kurtzman* test, therefore, is well-suited to a determination of the central issue in this case, taking into account the text and purpose of Article II, Section 4, and its embodiment of Establishment Clause principles.[12]

---

9. We recognize the possibility that the preferences referred to in *Larson v. Valente, supra,* and those comprehended within the Preference Clause may not be precisely the same notwithstanding the fact that the federal and state constitutional provisions embody common values.

10. The United States Supreme Court has long recognized that total separation between church and state is not mandated by the Establishment Clause and is not possible in an absolute sense. *E.g., Lemon v. Kurtzman, supra,* 403 U.S. at 614, 91 S.Ct. at 2112, 29 L.Ed.2d at 756; *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct.

679, 96 L.Ed. 954 (1952). We too have expressly acknowledged this fact. *Americans United.*

11. *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) held that the Establishment Clause prohibits laws that aid one religion, aid all religions, or prefer one religion over another.

12. The United States District Court in *Citizens Concerned I* and *Citizens Concerned II* applied the *Lemon v. Kurtzman* test to determine whether the Establishment Clause was violated by Denver's nativity scene display. Although these cases were decided before *Larson v. Valente, supra,* the strict scrutiny test, as previ-

First, it cannot be doubted that if Denver's purpose in displaying the nativity scene is to sponsor or endorse the Christian religion, the Preference Clause would be violated. Second, even if Denver's purpose is wholly secular, the Preference Clause could not tolerate the nativity scene display if it has a principal or primary effect that advances the Christian religion. Finally, excessive governmental entanglement with religion would offend against the principle of constitutional neutrality embodied in Article II, Section 4. *See Americans United.* In applying the test of *Lemon v. Kurtzman* we note that failure to satisfy any one of the three criteria would establish violation of the Preference Clause.

We now proceed to test the evidence adduced by the plaintiffs against the *Lemon v. Kurtzman* criteria to determine whether the plaintiffs have established a prima facie case sufficient to survive a motion to dismiss.[13]

2.

In a trial to the court a motion to dismiss at the conclusion of the plaintiff's evidence must be evaluated pursuant to C.R.C.P. 41(b)(1), which provides, in pertinent part:

After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render judgment until the close of all the evidence. If the court renders judgment on the merits against the plaintiff, the court shall make findings as provided in Rule 52(a).

*Central City Opera House Ass'n v. Brown,* 191 Colo. 372, 553 P.2d 64 (1976); *Kvols v. Lonsdale,* 164 Colo. 125, 433 P.2d 330 (1967); *Teodonno v. Bachman,* 158 Colo. 1, 404 P.2d 284 (1965). This was the standard that should have been applied in ruling on Denver's motion to dismiss.

Counsel for Denver, however, couched the motion in terms of the asserted failure of the plaintiffs to establish a prima facie case "even looking at the evidence in the light most favorable to them." The plaintiffs met this argument by urging that a prima facie case had been established. The trial court ruled that "even viewing the evidence [in the light] most favorable to the plaintiffs, and giving every reasonable inference that may be drawn therefrom," no violation of *Colo. Const.* Art. II, § 4, had been shown. It is apparent from the record that counsel and the court erroneously assumed that the standards applicable to a motion for a directed verdict under C.R.C.P. 50(a) were to be applied rather than the C.R.C.P. 41(b)(1) procedure and criteria. *See e.g., Nettrour v. J.C. Penney Co.,* 146 Colo. 150, 360 P.2d 964 (1961). On this appeal no party has challenged the correctness of the standards adopted by the trial court. In discussing the standards to be applied in ruling on a motion for dismissal at the conclusion of the plaintiff's case in a court trial, however, we have stated

---

ously discussed, would seem to become applicable only after a determination has been made that the government is according differential treatment to various religions, the central issue in *Citizens Concerned I* and *Citizens Concerned II.*

**13.** Challenges to governmental nativity scene displays under the Establishment Clause have been rewarded with success in some federal cases. *Donnelly v. Lynch,* 525 F.Supp. 1150 (D.R.I.1981), *aff'd,* 691 F.2d 1029 (1st Cir.1982); *Citizens Concerned I, rev'd on other grounds,* 628 F.2d 1289 (10th Cir.1980); *see Allen v. Hickel,* 424 F.2d 944 (1970). *Citizens Concerned II* reached the opposite result, as have

other federal courts on somewhat analogous facts. *Cf. Florey v. Sioux Falls School District,* 619 F.2d 1311 (8th Cir.1980), *cert. denied,* 449 U.S. 987, 101 S.Ct. 409, 66 L.Ed.2d 251 (1980) (rejecting First Amendment challenge to school board policy statement and rules relating to public school programs in observance of religious holidays); *Anderson v. Salt Lake City Corporation,* 475 F.2d 29 (10th Cir.1973), *cert. denied,* 414 U.S. 879, 94 S.Ct. 50, 38 L.Ed.2d 124 (1973) (placement of permanent monument inscribed with Ten Commandments and religious symbols on courthouse grounds held not to violate Establishment Clause).

It is true that when reviewing a dismissal entered at the conclusion of the plaintiffs' evidence in a jury trial, the rule urged by the plaintiffs that the evidence must be viewed in the light most favorable to the plaintiffs is applicable. [Citations omitted.] But when the trial is to the court, as it was here, the trial court is the finder of fact and may make its findings and render judgment against the plaintiffs at the close of the plaintiffs' case. Rule 41(b).

*Teodonno v. Buchman, supra,* 158 Colo. at 4, 404 P.2d at 285; *accord, Central City Opera House Ass'n v. Brown, supra; Kvols v. Lonsdale, supra.*

It is apparent without exploring the precise contours of a judge's authority in ruling on a motion under C.R.C.P. 41(b)(1) that the test that a plaintiff must meet under that rule is more exacting than the one applied under C.R.C.P. 50(a), where all evidence must be viewed in the light most favorable to the plaintiffs. Therefore, if the trial court was correct in ruling that the plaintiffs failed to meet even the less demanding requirements of C.R.C.P. 50(a), it might well be argued that its order of dismissal should stand because plaintiffs would not have been prejudiced by the choice of an incorrect but less demanding test.[14]

■ We need not resolve the case on this basis, however, for a review of the trial court's ruling under the standard applied by it persuades us that the ruling is incorrect when tested by that criterion. Therefore, the judgment must be reversed.

**a.**

The first inquiry under *Lemon v. Kurtzman, supra,* is whether the governmental purpose is secular. The record before us contains no direct evidence of Denver's purpose in making the creche part of the Christmas display on the steps of the City and County Building. We note that in the two separate United States District Court proceedings relating to the predecessors of the 1981 display in question here Denver presented evidence of purpose that led the district court in *Citizens Concerned II* to find that Denver had "shown a sufficient secular legislative purpose for its sponsorship of the display and the inclusion of a creche in that display." 526 F.Supp. at 1311. In *Citizens Concerned I,* based on a somewhat different evidentiary presentation, the trial court found that Denver's claim of secular purpose was troublesome in light of conflicting evidence, but held that it was unnecessary to make a definite finding because of its ruling that the creche display could not pass the effects test or the entanglement test under *Lemon v. Kurtzman, supra.*

In the instant case the limited evidence before the trial court supports no single inference about Denver's intent in including the creche in its lighting display. The evidence is as consistent with an intent merely to depict a collection of items having historical significance in the development of the traditions of Christmas as with an intent to endorse the religious significance that the creche possesses for the members of the Christian faith. We hold that the plaintiffs failed to establish a prima facie case that Denver had a non-secular purpose in mak-

---

**14.** *See Central City Opera House Ass'n v. Brown, supra,* 191 Colo. at 377, 553 P.2d at 67: "If the district court . . . found that the plaintiff had not established a prima facie case, it follows that the court of necessity was ruling that the plaintiff was not entitled to recover under the evidence." While the trial court in its discretion has the option of declining to consider a defendant's motion to dismiss under C.R.C.P. 41(b)(1), we have previously reviewed a trial court's dismissal that was based on the inappropriate standards of C.R.C.P. 50(a) rather than remanding the case to the trial court for a ruling under the correct C.R.C.P. 41(b)(1) standards. *Central City Opera House Ass'n v. Brown, supra; People ex rel. Dunbar v. Lee Optical Co. of Denver,* 168 Colo. 345, 452 P.2d 21 (1969). On another occasion, we chose to review a trial court's order of dismissal pursuant to C.R.C.P. 41(b)(1) by drawing from the record every reasonable inference in favor of the plaintiff when the trial court had failed to make any findings of fact. *Reed v. United States Fidelity and Guaranty Co.,* 176 Colo. 568, 491 P.2d 1377 (1971).

ing the nativity scene part of the Christmas display.

b.

We next address the question of the effect of Denver's holiday display. In evaluating whether the nativity scene has a principal or primary effect that neither advances nor inhibits religion, we follow the lead of the United States Supreme Court in holding that it is sufficient to establish a constitutional violation if one of the principal or primary effects is the advancement or inhibition of religion; *i.e.,* we recognize that for the purpose of this test the display may have more than one principal or primary effect. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 783–84, n. 39, 93 S.Ct. 2955, 2971 n. 39, 37 L.Ed.2d 948, 969 n. 39 (1973).

The trial court's ruling indicates that the plaintiffs have established no more than that they themselves were offended by the display. We believe this assigns an inappropriately narrow scope to that evidence in light of the C.R.C.P. 50(a) standard, utilized by the trial court, requiring that the evidence be considered in the light most favorable to the plaintiff.

Giving appropriate scope to the plaintiffs' evidence, and drawing all reasonable inferences in favor of the plaintiffs, as C.R.C.P. 50(a) requires, that evidence was adequate to establish that the creche represents Christianity and that it has an inherent religious significance that is not lost by inclusion among other display elements representing the secular side of the Christmas holiday. Supportive of this opinion evidence is the testimony that some people held religious observances, singly and in groups, before the nativity scene. The placement of the creche on the steps of the seat of government of the City and County of Denver had the effect upon several witnesses of causing them to believe that Denver endorses the religious message that the nativity scene represents. Based on this perception of the display, two of the witnesses testified that to them it represented a preference by Denver of the Christian religion over all others. It is a reasonable inference from this evidence that other persons with similar backgrounds would draw the same conclusions. We may infer as well from the religious observances held at the scene of the creche that some Christians would also view the display as a governmental endorsement of Christian religious values. We conclude that the plaintiffs have established a prima facie case that a principal or primary effect of the display is to advance the Christian religion by causing a substantial number of persons to perceive Denver to be expressing a preference for that religion contrary to *Colo. Const.* Art. II, § 4.[15] Because the plaintiffs have established a prima facie case as to one of the three applicable criteria, the judgment of the district court must be reversed. However, for the guidance of the trial court, we go on to consider briefly the third *Lemon v. Kurtzman* test.

c.

The excessive entanglement test involves a dual inquiry. We must first ask whether excessive administrative entanglement exists, *Lemon v. Kurtzman, supra,* and then inquire whether governmental action is productive of "continuing political strife over aid to religion," *Committee for Public Education v. Nyquist, supra,* 413 U.S. at 794, 93 S.Ct. at 2976, 37 L.Ed.2d at 975; *but see Donnelly v. Lynch,* 691 F.2d 1029 (1st Cir. 1982).

Whether particular governmental action fosters excessive entanglement with religion is a question that has caused courts much difficulty. A clear illustration of this is to be found in the divergent views on this matter contained in *Citizens Concerned I* and *Citizens Concerned II,* each involving Denver's holiday display. Based on an evidentiary presentation similar to that in *Citi-*

---

**15.** The location of the nativity scene, on the steps of Denver's seat of government, can be seen as symbolically significant, lending credence to the witnesses' testimony that they perceived the display as an expression of governmental religious preference. *Cf. L. Tribe, American Constitutional Law* § 14–5 (1978) (inclusion of religious elements in school activities is reflective of symbolic governmental support for the religious activity).

*zens Concerned II,* the court in *Citizens Concerned I* found administrative entanglement by reason of the perception of affiliation between government and religion created in the minds of the people by Denver's inclusion of the nativity scene in the Christmas display. It also found an ample showing of the forbidden divisiveness in the evidence reflecting an emotional intensity in those favoring the display as well as those opposing it. *See also Donnelly v. Lynch,* 525 F.Supp. 1150 (D.R.I.1981); *aff'd.* 691 F.2d 1029 (1st Cir.1982). The court in *Citizens Concerned II,* however, observed that "in light of the secular purpose of the total display and a non-religious primary effect, no religious group or groups are being benefited and divisiveness on religious lines is not likely to be intensified." 508 F.Supp. at 829. The *Citizens Concerned II* court held that any other ruling would be unfaithful to the common sense approach to Establishment Clause questions mandated by *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952).

The entanglement test involves sensitive and complex determinations to draw the line between permissible and forbidden governmental administrative entanglement and in assessing when political strife is promoted to a constitutionally unacceptable degree. For the present it is sufficient to say that the testimony of the witnesses, summarized earlier in this opinion, is indicative of a politically divisive impact caused by Denver's display of the creche.

### B.

We now address the plaintiffs' claims of error with regard to four separate evidentiary rulings of the trial court. We find that the trial court committed error in one of these evidentiary rulings and accordingly instruct the trial court to consider such evidence on remand.

### 1.

· The plaintiffs claim that reversible error occurred when the court and counsel for the defendant questioned witnesses about their

religious beliefs in violation of C.R.E. 610, which provides:

> Evidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purposes of showing that by reason of their nature his credibility is impaired or enhanced.

■ There is no indication in the record that the trial court admitted this evidence for the sole purpose of impeaching or enhancing credibility of the witnesses.[16] On the other hand, the evidence is relevant to the determination of other questions, including the plaintiffs' standing to sue, the personal knowledge of certain witnesses as to religious practices about which they testified, and the basis for witnesses' opinions that the effect of the nativity scene was to prefer the Christian religion. We find no merit in the plaintiffs' contention that questioning of the witnesses about their religious beliefs was objectionable under C.R.E. 610.

### 2.

■ The plaintiffs made an offer of proof at trial that a witness would testify that, in certain countries with established religions, statues of gods representative of those religions are placed in front of government buildings. The trial court sustained the defendant's objection to this evidence on the ground of relevance. The plaintiffs argue that this evidence is relevant because it tends to establish that the municipality of Denver is acting like other governments with established religions.

> Relevant evidence is defined as that having any tendency to make the existence of any *fact* that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

C.R.E. 401 (emphasis added). The central facts of consequence to this case concern the actions of the municipality of Denver and the effect of those actions upon the plaintiffs and others. Activities in foreign

---

**16.** The trial court specifically reassured one witness after such questioning that "the Court is not critical of you or your beliefs any more than I would want you to be critical of mine."

countries can in no way bear on facts of consequence to the constitutional sufficiency of Denver's actions. At most, the proffered evidence is relevant to the legal conclusion that the plaintiffs would like the courts to adopt, namely, that the display of a religious symbol in front of a government building constitutes an establishment of a state religion. The evidence was properly excluded on relevancy grounds.

### 3.

■ One witness for the plaintiffs testified that he observed what appeared to be a religious service held on the steps of city hall in front of the nativity scene and that a person who appeared to be the leader of the group stated "This is Jesus Christ, the Son of the living God who was sent by God to save the world." An objection to this statement on hearsay grounds was sustained by the court over the plaintiffs' assertion of the state of mind exception.

> Hearsay is defined by C.R.E. 801(c) as a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

It is self-evident from the nature of the plaintiffs' claims that they did not offer the statement by the out-of-court declarant for the purpose of proving the truth of the statement that Jesus Christ is the Son of God. The profferred testimony is relevant to the plaintiffs' claim that the nativity scene became a "place of worship." It is the fact that the statement was made, and not its truth or falsity, that is relevant. Therefore, it was error to exclude the statement.

This erroneous evidentiary ruling, however, did not affect a "substantial right" of the plaintiffs as required by C.R.E. 103(a) to support a claim of error, because the court allowed other evidence by at least three witnesses who observed what appeared to be religious services and praying in front of the creche. We are not required to consider whether reversible error has occurred because of the procedural posture of this case. We instruct the trial court on

remand to consider the proffered statement in further proceedings in this litigation.

### 4.

■ At trial, the plaintiffs requested that the trial court take judicial notice of several facts, including: (1) the nativity scene represents the birth of Jesus and the figures in the scene represent the Christian religious figures of Jesus, the Virgin Mary, and Joseph, (2) the Christian faith is a religious "denomination," and (3) the plain meaning of the word "preference" is "to single out for particular attention, to choose from others." Opposing counsel objected that these items were subject to dispute, and the trial court ruled against the plaintiffs. We find that the trial court did not err in its rulings.

The plaintiffs' contention that the trial court did not judicially notice that the nativity scene represents the birth of Christ is not supported by the record. In the court's ruling on the motion to dismiss, that fact was judicially noticed, as well as the fact that the only religion symbolized by the nativity scene is Christian. The trial court refused to extend this ruling, however, to a finding that the nativity scene exclusively represents a Christian religious event because that question is subject to reasonable dispute within the context of this litigation. C.R.E. 201.

Under the Colorado Rules of Evidence, only "adjudicative facts" may be judicially noticed, and any such fact

> must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

C.R.E. 201(b). Any fact judicially noticed is deemed conclusively established in a civil case. C.R.E. 201(g).

Advisory Committee notes to Federal Rule of Evidence 201, which is identical to the Colorado rule, define legislative facts, as opposed to adjudicative facts, as "those which have relevance to legal reasoning and

the lawmaking process, whether in the formulation of a legal principle or ruling by a judge or court or in the enactment of a legislative body." Federal Rules of Evidence, Note to Subdivision (a) of Rule 201, Notes of Advisory Committee on Proposed Rules. The comment further explains that such facts are needed in thinking about difficult questions of law and policy and are, therefore, usually outside the domain of the "clearly indisputable."

■ The words "denomination" and "preference" are key terms in the constitutional provision under consideration, and the definition of these terms will, in part, eventually determine the relative rights of the parties. In making its final legal conclusion about the meaning of these terms within the context of *Colo. Const.* Art. II, § 4, the court should be free to accept or reject several relevant "legislative facts," such as the dictionary definitions of these terms, the use of these words in other cases, and the probable intent of the drafters of the constitution as indicated by any historical facts. Acceptance of the plaintiffs' definition of these terms would foreclose the court's proper consideration of several fact and policy questions. These items, therefore, are not subject to the judicial notice rule, and the trial court's ruling was correct.

## VI.

Because we conclude that the plaintiffs established a prima facie case, further proceedings will be required. The trial court in its discretion may permit the plaintiffs to reopen their case to present further evidence in light of the additional guidance on appropriate legal principles contained in this opinion. Should the defendant renew its motion for dismissal after any such additional evidence is received, that motion should be tested under the appropriate C.R. C.P. 41(b)(1) standards and procedures.

We vacate the order of dismissal and remand this case to the trial court for further proceedings in accordance with the views expressed in this opinion.

ERICKSON, J., dissents.

HODGES, C.J., and LEE, J., join in the dissent.

ERICKSON, Justice, dissenting:

I dissent because I do not believe that the plaintiffs have established their standing to bring suit under *Colo. Const.* art. II, § 4. I would therefore find that the plaintiffs have failed to establish the minimum requirements for standing to assert the constitutional issues in this case and uphold the trial court's dismissal of the plaintiffs' case.

Standing is a prudential doctrine designed to ensure that the judiciary does not become involved in an issue until there are adverse parties who can demonstrate a "distinct and palpable injury" which is "likely to be redressed if the requested relief is granted." *Gladstone Realtors v. Village of Bellwood,* 441 U.S. 91, 99 S.Ct. 1601, 60 L.Ed.2d 66 (1979); *Warth v. Seldin,* 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Dodge v. Department of Social Services,* 198 Colo. 379, 600 P.2d 70 (1979) (Dubofsky, J., specially concurring). The courts should "refrain from adjudicating 'abstract questions of wide public significance' which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Valley Forge Christian College v. Americans United for Separation of Church and State,* 454 U.S. 464, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). *See also Citizens Concerned For Separation of Church and State v. Denver,* 628 F.2d 1289 (10th Cir.1980).

The plaintiff, Phillip Danielson, is the lone resident of Denver. The remaining plaintiffs are non-residents, who assert standing to sue because of their payment of certain excise taxes and because of their intangible interests in a government which does not prefer or support the Christian religion. I agree with the holding in *Valley Forge Christian College, supra,* that a challenge to allegedly unconstitutional spending by executive action does not meet the requirements of taxpayer standing. *Id.* at 762–63. *See also United States v. Richard-*

son, 418 U.S. 166, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974); *Schlesinger v. Reservists Committee to Stop the War,* 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974).

I do not believe that the standing doctrine permits the judicial branch to hear "generalized grievances about the conduct of the government." *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The mere assertion that intangible interests of citizens are being unconstitutionally affected by governmental action does not elevate a claim above the minimum standing requirements:

"Although they claim that the Constitution has been violated, they claim nothing else. They fail to identify any personal injury suffered by the plaintiffs *as a consequence* of the alleged constitutional error, other than the psychological consequences presumably produced by observation of conduct with which one disagrees. That is not an injury sufficient to confer standing under Art. III, even though the disagreement is phrased in constitutional terms. It is evidence that respondents are firmly committed to the constitutional principle of separation of church and State, but standing is not measured by the intensity of the litigant's interest or the fervor of his advocacy. '[T]hat concrete adverseness which sharpens the presentation of issues," *Baker v. Carr,* 369 U.S. [186] at 204, 82 S.Ct. [691] at 703 [7 L.Ed.2d 663], is the anticipated consequence of proceedings commenced by one who has been injured in fact; it is not a permissible substitute for the showing of injury itself."

*Valley Forge Christian College,* 102 S.Ct. at 752 (emphasis in original). If this limitation were not imposed, any person could seek judicial review of a controversy, merely by a claim of any subjective injury to an intangible interest. The Colorado Constitution requires more. *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977); compare *Cloverleaf Kennel Club, Inc. v. Colorado Racing Comm'n,* 620 P.2d 1051 (Colo.1980), *with Dodge v. Department of Social Services, supra.*

The majority in *Valley Forge Christian College, supra,* noted that the injury allegedly suffered by the respondents would:

"[D]ictate recognition of respondent's standing to challenge execution of every capital sentence on the basis of a personal right to a government that does not impose cruel and unusual punishment, or standing to challenge every affirmative action program on the basis of a personal right to a government that does not deny equal protection of the laws, to choose but two among as many possible examples as there are commands in the Constitution."

102 S.Ct. at 767 n. 26. Similarly, I would hold that constitutional standing requires more than a plaintiff who is "offended, disturbed or upset" at some governmental action which arguably involves the Colorado Constitution.

This controversy is better left for resolution by the representatives of the City and County of Denver. While it may be appropriate for Denver to stop displaying a Christmas symbol which has provoked so much controversy, I do not believe that the mere assertion of a claim or controversy is sufficient to give plaintiffs the right to proceed in Colorado's courts.

I would therefore respectfully dissent to the finding of standing in this case.

Chief Justice HODGES and Justice LEE have authorized me to say that they join me in this dissent.